# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 95-20359

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONNIE LAMONT BLOUNT;
GAYLIN TEROD JOHNSON,

Defendants-Appellants.

---

Appeal from the United States District Court
For the Southern District of Texas

October 22, 1996

Before POLITZ, Chief Judge, WIENER and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:

Donnie Blount and Gaylin Johnson appeal their convictions for drug trafficking and firearms offenses. Concluding that the evidence presented was legally insufficient to convict on the firearms counts and that the district court erred in denying the defendants' motion to suppress, we reverse, render in part, and remand in part.

## Background

Near dawn on September 15, 1994, plainclothes officers of the Houston

2

Police Department and agents with the Bureau of Alcohol, Tobacco, and Firearms executed a search warrant on 3717 Campbell Street, a suspected crack house in Houston's Fifth Ward. As the police entered the house, a person matching the description of Richard J. Thomas, a/k/a "Ricky," whom the police suspected might be present and armed,[1] exited the rear of the house, jumped a fence, and fled on foot. Several ATF agents gave chase, lost contact with the suspect, searched the surrounding area for a few minutes, and then returned to the Campbell Street residence. Drugs, money, and a handgun were retrieved from the house.

After the Campbell Street residence had been secured, ATF agents Brown and Gary and HPD officer Weston resumed the search for Thomas, driving around the block, questioning neighbors, and searching an abandoned warehouse. Officer Weston saw Dorothy Cooksey who was standing on her stoop in her bathrobe and appeared agitated. Cooksey told Weston that minutes before Thomas had tried to force his way into her house.[2] Cooksey also told Weston that Thomas would "end up" at 2302 Bleker Street,[3] where "Lamont with the afro" lived and drugs were sold.

At this point, more than 30 minutes after the execution of the Campbell

---

[1]This suspicion was based solely upon an HPD computer entry reporting a sexual assault involving a firearm at the Campbell Street address. This report, entered two months prior to the execution of the search warrant, listed persons named "Ricky" and "Lamont" as suspects. At the time the Campbell Street warrant was executed there was no extant arrest warrant for Thomas.

[2]Cooksey identified a photograph of Richard J. Thomas shown her by agent Brown.

[3] 2302 Bleker Street is catercorner to 3717 Campbell Street.

Street warrant, the two agents and officer Weston approached 2302 Bleker Street, knocked on the front door, identified themselves, and asked the inhabitants to come out and talk to them. Someone inside shouted "who is it?" but no one opened the door; the agents could hear voices and shuffling sounds.

While the agents continued to knock on the front door, Weston went to the rear of the house and found a window with a broken pane. Although a piece of plywood covered most of the opening, by leaning against the house and pressing his face within inches of a small gap in the plywood covering, Weston was able to see inside where he saw Blount handling a combination lock on a closet door. Blount then walked out of view.

After trying for 20 minutes to gain consensual entry into the house, Brown radioed for reinforcements and ordered electrical services to the house cut off. Meanwhile Blount had called 911 and reported a burglary in progress; within minutes three marked police units arrived. The two police groups discussed the situation, and then Brown and a uniformed officer went to the front door and knocked.

Blount, seeing a uniformed officer, opened the door and was immediately seized, thrown to the ground, and handcuffed. The two other inhabitants of the house, defendant Johnson and a juvenile, came out and also were seized and handcuffed. All three were given a pat-down search.

After the defendants had been secured, Brown and Weston drew their weapons and entered the residence to conduct a "perimeter sweep." The stated

4

purpose of this sweep was to look for Thomas whom they believed, based on Cooksey's statement, might be hiding within. In the kitchen the officers observed a razor blade with a white residue which Weston field-tested and determined to be cocaine.

At this point Weston decided to secure a search warrant. He placed the residence under a police guard while the defendants were transported to police headquarters. The affidavit Weston submitted to a state magistrate included the facts set forth in the preceding narrative and a statement from Blount, made shortly after his arrest, stating that he had not answered the door because he was smoking marihuana. The police obtained a search warrant authorizing a search of 2302 Bleker Street and the seizure of any controlled substances found therein. The warrant also authorized the arrest of defendant Blount "and other persons unknown, accused in said affidavit."

Several hours after the initial search of 2302 Bleker Street the police executed the search warrant. In the closet secured by the aforementioned combination lock officers found a zippered shaving bag containing 168.1 grams of crack cocaine, 56.2 grams of powdered crack cocaine, assorted drug paraphernalia, a pistol, and a loaded .22 caliber rifle with a silencer and sawed-off stock. Police also found a .38 caliber revolver, later found to bear Blount's fingerprints, on top of a television stand in the living room. They also found a strongbox containing more cocaine and cash in a bedroom.

Blount and Johnson were indicted for conspiracy to possess with intent to

distribute 50 grams or more of cocaine, 21 U.S.C. § 846; aiding and abetting such possession, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2(a); using and carrying a firearm in relation to a drug trafficking offense, 18 U.S.C. § 924(c)(1); and using and carrying a firearm silencer or muffler in relation to a drug trafficking offense, 18 U.S.C. § 924(c)(1). The defendants moved to suppress the evidence obtained from execution of the Bleker Street search warrant, claiming that much of the information which formed the basis of the warrant application had been obtained unconstitutionally. This motion was denied.

Blount and Johnson were tried before the same jury. Blount was convicted on all four counts; Johnson was convicted on the drug charges but acquitted on the weapons charges. Both appeal.

Analysis

Both defendants challenge the sufficiency of the evidence for their conspiracy and aiding and abetting convictions.[4] To convict a defendant of participating in a drug conspiracy, the government must prove that an agreement existed between two or more persons to violate narcotics laws, that the defendant knew of the conspiracy and intended to join it, and that the defendant voluntarily participated in the conspiracy.[5] To convict on an aiding and abetting count, the

---

[4]We consider the factual sufficiency of the evidence presented prior to considering any alleged legal error to determine whether a retrial on these counts would violate the double jeopardy clause. **Burks v. United States**, 437 U.S. 1 (1978).

[5]**United States v. Inocencio**, 40 F.3d 716 (5th Cir. 1994). In this case the relevant narcotics law was possession with intent to distribute, which requires knowing possession, actual or constructive, of the cocaine and intent to distribute.

6

government must prove that the defendants associated with, participated in, and in some way acted to further the possession and distribution of cocaine.[6] We review the evidence in the light most favorable to the verdict to determine whether a rational juror could have found the defendants guilty beyond a reasonable doubt of the charged offenses.[7]

We find the evidence sufficient to sustain the convictions. The defendants were arrested in a house containing cocaine, drug paraphernalia, and weapons. Both defendants were members of or affiliated with a gang involved in the drug trade. Dorothy Cooksey and La Shundra Faye Houston testified that they witnessed both Blount and Johnson handling and selling cocaine at the Campbell Street residence. Items and money seized from each of the defendants suggest involvement in narcotics trafficking.[8] These facts, and the reasonable inferences which they give rise to, adequately establish the defendants' guilt on the conspiracy and aiding and abetting counts.

Next, Blount attacks the sufficiency of the evidence on the firearms convictions. The only evidence that Blount ever used or carried a firearm is the

---

**Id.**

[6]**United States v. Chavez**, 947 F.2d 742 (5th Cir. 1991).

[7]**United States v. Carrillo-Morales**, 27 F.3d 1054 (5th Cir. 1994), cert. denied, 115 S.Ct. 1163 (1995).

[8]A key seized from Johnson fit a lock box in which cocaine and currency, in denominations usually associated with drug transactions, were found; a key taken from Blount's belt fit the door to 3717 Campbell Street; and a handgun seized in the Bleker Street residence carried Blount's fingerprints.

presence of his fingerprints on a .38 caliber revolver recovered from the top of a television stand in the Bleker Street residence and the fact of his arrest in the house where that weapon was located. The government hypothesizes that Blount may have "used" the revolver by placing it out in the open to intimidate others during drug transactions.[9] While "the silent but obvious and forceful presence of a gun on a table can be a 'use'" under section 924(c)(1),[10] the government offered no evidence of this or a similar utilization. In the absence of any evidence suggesting that the revolver was "used" or "carried" for some end or purpose related to drug trafficking, this conviction cannot be upheld; "the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)."[11] We accordingly reverse this conviction and enter a judgment of acquittal as to Count 3 of the indictment.

Blount's conviction on the fourth count of the indictment, which charges use or carrying of a silencer-equipped firearm, warrants identical treatment. The government, whose entire case rests on Blount's activity at the door of the closet where the rifle was found, speculates that Blount "carried" the rifle and cocaine to the closet to conceal them from the ATF agents then at his front door. We conclude and hold that such an inference is not reasonable and sufficient to sustain

[9]Trial testimony and record photographs of the television stand reflect its height to be over six feet, making the presence of the subject pistol less than obvious. We consider this fact in assessing the plausibility of the government's theory.

[10]**Bailey v. United States**, 116 S.Ct. 501, 508 (1995). Merely having a weapon concealed nearby does not constitute a "use" under section 924(c)(1). **Id.**

[11]**Id.** Accord, **United States v. Andrade**, 83 F.3d 729 (5th Cir. 1996); **United States v. Fike**, 82 F.3d 1315 (5th Cir. 1996); **United States v. Wilson**, 77 F.3d 105 (5th Cir. 1996).

a conviction,[12] and we therefore reverse the conviction and render a judgment of acquittal.

Both defendants also challenge the district court's denial of their motion to suppress. We review for clear error the district court's factual findings, including those regarding the presence of exigent circumstances, and review *de novo* the ultimate conclusions on fourth amendment issues drawn from those facts.[13] In cases involving the use in a warrant affidavit of unconstitutionally obtained information, we first consider the propriety of the antecedent searches and seizures, excise from the warrant affidavit any tainted information, and then review that remaining *de novo* to determine the existence *vel non* of probable cause for issuance of the warrant.[14] We make the initial inquiry mindful that it is the government's burden to prove the admissibility of evidence obtained from warrantless searches and seizures.[15]

Proceeding chronologically, we begin with Weston's observation of Blount through the small aperture in the rear window. The district court found that

_____

[12]See **Fike**.

[13]**Ornelas v. United States**, 116 S.Ct. 1657 (1996); **United States v. Rico**, 51 F.3d 495 (5th Cir.), cert. denied, 116 S.Ct. 220 (1995).

[14]**United States v. Hassan**, 83 F.3d 693 (5th Cir. 1996); **United States v. Restrepo**, 966 F.2d 964 (5th Cir.1992), cert. denied, 506 U.S. 1049 (1993). Accord, **United States v. Shamaeizadeh**, 80 F.3d 1131 (6th Cir. 1996); **United States v. Markling**, 7 F.3d 1309 (7th Cir. 1993).

[15]**United States v. Roch**, 5 F.3d 894 (5th Cir. 1993). See also **Rico** (government bears burden of proving existence of exigent circumstances sufficient to rebut presumption that a warrantless search is unreasonable).

Weston's actions did not constitute an illegal search because he was in the backyard to seal an avenue of escape and not to peer into the window. This factual finding regarding Weston's subjective state of mind is inapposite to the question presented, *i.e.*, whether Weston's objective conduct invaded the defendants' legitimate expectation of privacy in the curtilage of their home.[16] We conclude and hold that when a police officer walks into the partially fenced back yard of a residential dwelling, using a passage not open to the general public, and places his face within inches of a small opening in an almost completely covered rear window to look into the house and at the inhabitants, that officer has performed a "search" within the meaning of the fourth amendment.[17]

---

[16]See **Whren v. United States**, 116 S.Ct. 1769 (1996) (proper focus of fourth amendment inquiry is objective conduct, and not subjective intent, of police officer); **United States v. Causey**, 834 F.2d 1179 (5th Cir. 1987) (*en banc*) (same). Because the district court's ruling was influenced by an incorrect view of the law the factual findings on this issue are due no deference. **United States v. Capote-Capote**, 946 F.2d 1100 (5th Cir. 1991) (citation omitted), cert. denied, 504 U.S. 942 (1992).

[17]**Brock v. United States**, 223 F.2d 681, 685 (5th Cir. 1955) (internal quotation marks omitted) (citation omitted) ("Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his right to be let alone as guaranteed by the Fourth Amendment"). See also **United States v. Dunn**, 480 U.S. 294 (1987) (discussing fourth amendment protection of residential curtilage). To support its contrary proposition the government cites **United States v. James**, 40 F.3d 850 (7th Cir. 1994), cert. denied, 115 S.Ct. 948 (1995). This Seventh Circuit case, aside from being in some respects contrary
to this circuit's precedent in **Brock**, is factually distinguishable. In **James**, the police approached the back door of a duplex reasonably believed to be "a principal means of access to the dwelling" along a paved walkway "readily accessible to the general public." **Id.**, 40 F.3d at 862. The defendants' yard had no such walkway and there is no record evidence suggesting that anyone considered the back door a "principal means of access" to 2302 Bleker Street.

The district court also found that, due to the exigent circumstances surrounding the police search for Ricky Thomas, Weston's actions did not require the preapproval of a search warrant.[18] Exigent circumstances include those in which officers reasonably fear for their safety or where there is the risk of a suspect fleeing or the destruction of evidence.[19] We consider several relevant factors in determining whether exigent circumstances exist, including

(1)    the degree of urgency involved and the amount of time necessary to obtain a warrant;
(2)    whether there is a reasonable belief that contraband is about to be removed or a suspect may flee;
(3)    the possibility of danger to police officers guarding the target site while a search warrant is sought;
(4)    information indicating that the suspects are aware that the police are on their trail; and
(5)    the ready destructibility of any contraband present.[20]

Any continuous police pursuit of Thomas had ended over 30 minutes before the police approached 2302 Bleker Street.[21] There is no evidence that the inhabitants of the house were aware of the police presence before the agents

---

[18]We assume *arguendo* the highly debatable proposition that Weston had probable cause to believe that Thomas was hiding inside the house.

[19]**Rico**; **United States v. Richard**, 994 F.2d 244 (5th Cir. 1993).

[20]**Id.**

[21]Thus, this case does not involve the exigent circumstance of "hot pursuit." **Welsh v. Wisconsin**, 466 U.S. 740, 753 (1984) ("the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime"); **United States v. Santana**, 427 U.S. 38, 43 (1976) ("'hot pursuit' means some sort of a chase").

11

knocked on the door and introduced themselves.[22] Aside from Cooksey's broad and uncorroborated statement, there was no indication that contraband would be found in the house and certainly no evidence regarding its "ready destructibility" or the risk of its removal or destruction. While the prospect of danger attends every narcotics investigation, the police were unaware of any particular danger to themselves or others which might distinguish this case from the norm.[23] Agent Brown was in a position to call in reinforcements, which he subsequently did, and seek a warrant while keeping the house under surveillance, a markedly safer course of action than brazenly confronting the unknown in 2302 Bleker Street. In short, "[t]here was no basis, on these facts, for believing that resort to a magistrate would have created risks of a greater magnitude than those which are present in any case where the police have probable cause but delay entry pending receipt of a

---

[22]Compare **Richard**; **United States v. Munoz-Guerra**, 788 F.2d 295 (5th Cir. 1986).

[23]There is no record evidence that Thomas was armed when he fled the Campbell Street residence. Although several officers who were involved in the initial chase testified, none of them reported seeing a firearm on Thomas. In addition, the confidential informant behind the Campbell Street warrant affidavit stated that the only firearm in the Campbell Street residence was the .38 caliber revolver which was seized after Thomas had fled the scene. Thus, police suspicion that Thomas was armed stemmed entirely from a computer report, several months old, implicating Thomas in an offense involving a firearm. See Note 1, *supra*. While the facts of this case do not require us to confront the issue, we observe that there is conflicting case law in this circuit regarding whether the presence of firearms alone creates exigent circumstances. <u>Contrast</u> **Rico**, 51 F.3d 495, 501 (exigent circumstances exist "where firearms are present"), quoting **United States v. Mendoza-Burciaga**, 981 F.2d 192, 196 (5th Cir. 1992), <u>cert</u>. <u>denied</u>, 114 S.Ct. 356 (1993), <u>with</u> **Capote-Capote**, 946 F.2d at 1103 (5th Cir. 1991) ("the mere presence of weapons . . . does not alone create exigent circumstances"), citing **Munoz-Guerra**, 788 F.2d at 298 (listing cases).

12

warrant."[24]   The district court's finding of exigent circumstances was clearly erroneous; Weston's observations through the rear window must be excised from the warrant affidavit.

Defendants next claim that Blount's statement that he had been smoking marihuana in the Bleker Street residence was the fruit of an unconstitutional arrest.[25]  The district court found that the police had probable cause to arrest Blount and Johnson for the crimes of harboring a fugitive (Thomas) and possessing contraband.[26]   We therefore must consider whether under the totality of the circumstances that the police had probable cause to arrest the defendants for these offenses.[27]

A precondition to the crime of harboring a fugitive under federal law[28] is the

---

[24]**Munoz-Guerra**, 788 F.2d at 298.

[25]**United States v. Wilson**, 36 F.3d 1298 (5th Cir. 1994).  Because we focus upon the defendants' custodial arrest we do not reach the question whether the police containment of 2302 Bleker Street at some point amounted to a search or seizure cognizable under the fourth amendment.

[26]Our review of the record persuades that this justification for the arrests evolved during the defendants' trial, with supporting testimony from Weston elicited by the leading questions from the prosecutor.  Our holding in **Causey**, however, requires that we ignore this pretextual submission and confine our examination to the propriety of the
officers' objective actions.  **United States v. Flores**, 63 F.3d 1342 (5th Cir. 1995).

[27]**Illinois v. Gates**, 462 U.S. 213 (1983).  See also **Whiteley v. Warden**, 401 U.S. 560 (1971) (the same probable cause standard governs arrests with or without a warrant).

[28] 18 U.S.C. § 1071.

13

issuance of an arrest warrant.[29] The police were well aware that there was no extant arrest warrant for Thomas at the time the defendants were arrested.[30] The analogous Texas statute[31] requires knowledge of the fugitive's status and some affirmative action hindering police access to a felon.[32] The police in this case simply arrested the defendants on first sight, inquiring about Thomas's whereabouts only after the defendants had been "secured." On these facts we conclude that an objectively reasonable police officer would have had no probable cause to arrest the defendants for harboring a fugitive.[33]

We reach a similar conclusion regarding the "possession of contraband" argument. The only factual basis for this theory is the statement of Dorothy Cooksey, whom the police had spoken to only briefly and about whom they knew nothing. Her vague assertion that drugs were sold at 2302 Bleker Street was

---

[29]**Id.** See **United States v. Zerba**, 21 F.3d 250 (8th Cir. 1994); **United States v. Lockhart**, 956 F.2d 1418 (7th Cir. 1992).

[30]See Note 1, *supra*.

[31]Tex. Penal Code Ann. § 38.05.

[32]**Antu v. Eddy**, 914 S.W.2d 166, 173 (Tex.App. - San Antonio 1995) ("[w]ithout some indication that the Eddys not only knew that Bradley was in the house, but that the officers were seeking to arrest Bradley, no reasonably prudent officer could conclude that there was probable cause to believe that Billy Eddy harbored Bradley").

[33]**Ornelas** at 1661-62 ("[t]he principal components of a determination of . . . probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause").

14

uncorroborated and bereft of detail, *i.e.* lacking in any indicia of reliability.[34] Under the totality of these circumstances we conclude that Blount's arrest was without probable cause and therefore violated the fourth amendment.

This does not end our inquiry, however; a statement made by a suspect after an illegal arrest should not be suppressed if it is both voluntary and sufficiently removed from the illegal seizure to break the causal chain linking the statement to the arrest.[35] Assuming *arguendo* that Blount's statement was voluntary, we nonetheless find that given the brief period of time between the arrest and the statement, the domineering police presence, and the absence of any intervening circumstances, the statement is not so attenuated as to be purged of the illegal arrest's taint.[36] Blount's inculpatory statement must also be excised from the Bleker Street warrant affidavit.

Finally, we turn to Brown's and Weston's warrantless search of the

---

[34]**United States v. Fisher**, 22 F.3d 574 (5th Cir.), cert. denied, 115 S.Ct. 529-30 (1994); **Roch**; **United States v. Laury**, 985 F.2d 1293 (5th Cir. 1993). The government contends that an "average citizen" like Cooksey should be presumed credible. The government cites to **United States v. Fooladi**, 703 F.2d 180, 183 (5th Cir. 1983), a pre-**Gates** case applying the now superseded **Aguilar-Spinelli** test to discern probable cause. While *dicta* in **Fooladi** supports the government's position, its holding does not: "[b]ecause the information came from a non-professional informant, was detailed, and was corroborated by the personal observations and investigations of the police, we hold that the reliability prong of **Aguilar** and **Spinelli** was satisfied." Here, we state only the uncontroversial proposition that under the "totality of the circumstances" standard announced in **Gates** the generalized and uncorroborated statement of a "citizen informant," without more, is not enough.

[35]**Dunaway v. New York**, 442 U.S. 200 (1979); **Brown v. Illinois**, 422 U.S. 590 (1975); **Wilson**.

[36]**Id.**

15

residence.  The district court found that the search was justified due to exigent circumstances and as a "protective sweep" incident to lawful arrest.  "Exigent circumstances . . . do not pass Fourth Amendment muster if the officers deliberately create them."[37]  We have already noted the absence of exigent circumstances at the time of Weston's rear window search.  The only new circumstances present at the time the house was searched were those created by the agents' persistent efforts to question the defendants and search their home.[38]  We restate our conclusion that the district court's ruling on this point constitutes clear error.

The "protective sweep" rationale must also fail.  While we have extended the Supreme Court's holding in **Maryland v. Buie**[39] to permit a protective sweep ancillary to a <u>warrantless</u> arrest,[40] the fourth amendment decidedly does not sanction such a search incident to an <u>illegal</u> arrest.[41]  Our prior holding that the

---

[37]**Richard**, 994 F.2d at 248 (citations omitted).

[38]<u>Compare</u> **Richard**; **Munoz-Guerra**.  <u>Contrast</u> **Rico**, 51 F.3d at 506 (distinguishing **Munoz-Guerra** and **Richard** on grounds that "[h]ere it was the unprovoked conduct of the suspects that led the agents reasonably to believe that the suspects intended to depart momentarily in a vehicle likely containing contraband").

[39] 494 U.S. 325 (1990).

[40]See, e.g., **Mendoza-Burciaga**.

[41]See **Oregon v. Elstad**, 470 U.S. 298 (1985) (contrasting exclusionary rule governing **Miranda** and fourth amendment violations); **Wong Sun v. United States**, 371 U.S. 471 (1963) (discussing "fruit of poisonous tree" doctrine of the fourth amendment's exclusionary rule).

defendants were illegally arrested forecloses this argument.[42]   Accordingly, all information obtained from the warrantless search of 2302 Bleker Street must be excised from the warrant affidavit.

We review *de novo* the redacted search warrant affidavit for 2302 Bleker Street to determine whether it demonstrates probable cause.  The redacted affidavit sets out the following facts:

(1) the circumstances surrounding the execution of the Campbell Street warrant and the search for Thomas (who is not named);

(2) the statement of Cooksey (who is not named) that 2302 Bleker Street was Thomas's "residence" and that it was also a "known drug house";[43]

(3) the police knocking and announcing at 2302 Bleker Street;

(4) the refusal of inhabitants to open the door;

(5) the sounds of persons "moving around" inside the residence;

(6) the arrival of marked patrol cars due to a 911 call from the occupants of the residence;

(7) the front door ultimately being opened by Blount;

(8) the affiant's "personal knowledge" that drug dealers keep all manner of documents and paraphernalia in their residences or places of business.

---

[42]Thus, we have no occasion to consider whether the police action, given its timing (after outdoors arrest effectuated) and scope (entire residence), exceeded the exception to the warrant requirement articulated in **Buie**.

[43]This representation appears to vary somewhat from Cooksey's and Weston's trial testimony regarding what Weston was told by Cooksey during their initial encounter.  Because the defendants did not challenge this portion of the affidavit in the district court or on appeal, we do not consider the issue.  **Feldt v. Mentor Corp.**, 61 F.3d 431, 436 n.7 (5th Cir. 1995), <u>cert. granted and judgment vacated</u>, 116 S.Ct. 2575 (1996).

The search warrant authorizes the seizure of controlled substances.[44]  Of the listed facts only Cooksey's statement suggests that controlled substances were located in 2302 Bleker Street.  That statement is extremely generalized, *i.e.*, "the residence at 2302 Bleker [is] a known drug house," is attributed to a source not identified in the affidavit and, as we have already discussed, bears no indicia of reliability.  Such a "bare bones" allegation of criminal activity cannot sustain the warrant.[45]  Because there was no probable cause for the warrant's issuance, all of the evidence seized pursuant to the warrant must be suppressed.  Given the substantial amount of evidence thus excluded, the error was not harmless and, accordingly, the convictions of both of the defendants on Counts 1 and 2 of the indictment must be vacated and remanded for further proceedings.

In sum, we vacate and remand the defendants' convictions on Counts 1 and 2 of the indictment.  We reverse Blount's convictions on Counts 3 and 4 of the indictment and render a judgment of acquittal on those counts.  Finally, we reverse the district court's ruling on the motion to suppress, concluding that all evidence seized pursuant to the Bleker Street search warrant must be suppressed.

REVERSED in part, VACATED and REMANDED in part.

---

[44]The search warrant did not authorize the police to search the house for Ricky Thomas.  We therefore need not discuss whether the police had probable cause to search the house for and arrest Thomas.  See note 17, *supra*; **Steagald v. United States**, 451 U.S. 204 (1981); **Payton v. New York**, 445 U.S. 573 (1980).

[45]**United States v. Satterwhite**, 980 F.2d 317 (5th Cir. 1992).

ENDRECORD

RHESA HAWKINS BARKSDALE, Circuit Judge, concurring in part, and dissenting in part:

Sadly, the appellants' criminal conduct is not remarkable; instead, it is typical of that unearthed by the ongoing, dangerous fight, under federal and state law, against gang-related drug trafficking. What is remarkable, however, is the conclusion reached by the majority on the suppression issue. For it, the majority opinion appears to "dot all the i's and cross all the t's"; it is facially appealing. But, with all due respect, it is wrong. It is wrong on the facts; it is wrong on the law. For example, the opinion refers to the Officers involved in the raid as *"plainclothes* officers of the Houston Police Department and agents with the Bureau of Alcohol, Tobacco, and Firearms". **Op.** at 2 (emphasis added). Incredibly, no mention is made of, nor consideration given to, the fact that they were attired in plainly marked raid gear and were members of a violent gang task force.

Accordingly, although I concur that the evidence was sufficient to support the convictions for conspiracy and aiding and abetting, and, although *dubitante*, that the evidence was not sufficient to support Blount's firearms convictions, I must dissent from the reversal of the denial of the suppression motions.

## I.

The facts are straightforward and, as stated, quite typical. Acting pursuant

to a search *and arrest* warrant that is not challenged on appeal, police officers and ATF agents assigned to a violent gang task force, and attired in clearly marked raid jackets, searched the designated house and found the expected drugs, money, and handgun. They pursued, but could not apprehend, the suspect, whose escape through the back of the house was aided by the presence of a pit bull dog that confronted the Officers when they went behind the house. Shortly thereafter, as the search continued, a neighbor, who lived only two houses away from the house just searched and who had just seen the suspect because he tried to break into her home, advised the Officers that the suspect could be found at the house adjacent to (*15 feet from*) the house just searched. The Officers proceeded to that nearby adjacent house and announced their presence. One Officer understandably stationed himself between the house just searched and that adjacent house. When the occupants refused to open the door, the Officer understandably knocked on a partially uncovered window that faced the house just searched, announced the Officers' presence and desire to talk to the occupants, and, understandably, looked inside the house. And, when the occupants finally opened the door, the Officers understandably arrested them and made a protective sweep; during it, they found cocaine residue in plain view. Based on the foregoing, a search and arrest warrant was obtained for this second house. Evidence of drug trafficking and weapons were found, and convictions obtained.

To say the least, the procedures followed for the second house were reasonable, especially in light of the immediacy and danger surrounding any drug

trafficking raid, and, most especially, where, as here, there is reliable information that weapons are involved. In fact, the procedures followed were far more than reasonable; they were mandated by the circumstances. In any event, the procedures certainly were not the "unreasonable searches and seizures" proscribed by the Fourth Amendment. Yet, the majority finds them to be so. It is correct that probable cause rulings are reviewed *de novo*; but, in so doing, the majority insists upon unreasonable, not reasonable, actions. And, for those rulings reviewed only for clear error, the majority acts instead, I am afraid, as the trier of fact.

## II.

The majority concludes that the evidence seized, pursuant to a search warrant, from the adjacent house, 2302 Bleker Street, must be suppressed because the supporting warrant affidavit is based on information obtained in violation of the Fourth Amendment. Specifically, it holds that Officer Weston's observation of Blount through an opening in the rear window of 2302 Bleker was an illegal search because there were no exigent circumstances that justified the Officer's presence at that location; and that the Officers did not have probable cause to arrest Blount and Johnson for the crimes of harboring a fugitive (Thomas) and possession of contraband. Pursuant to these holdings, the ensuing protective sweep of 2302 Bleker, during which the Officers observed cocaine residue on a razor blade in the kitchen, was unlawful, and Blount's statement was the product of an unlawful arrest.

The analysis leading to these conclusions is flawed because (1) it fails to give

sufficient weight to the information given to the police by the neighbor, Cooksey; and (2) it states incorrectly that the Officers did not have a warrant to arrest the suspect who fled from the first house searched, 3717 Campbell. Moreover, the analysis fails to accord proper deference to the state court judge's determination of probable cause, and the invalidation of the search warrant ignores the Supreme Court's teaching that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants", as well as the Court's admonition that "courts should not invalidate warrants by interpreting affidavits in a hyper technical, rather than a common sense, manner." *Illinois v. Gates*, 462 U.S. 213, 236-37 & n.10 (1983). The denial of the suppression motions should be affirmed; the Officers' conduct which led to the development of the information in the affidavit for the 2302 Bleker search warrant was objectively reasonable under the totality of the circumstances.

The Officers' presence at 2302 Bleker was justified by exigent circumstances. Whether such circumstances exist is a factual finding reviewed only for clear error. *E.g.*, *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993). On the other hand, determinations of reasonable suspicion and probable cause are to be reviewed *de novo* on appeal; but, the Supreme Court recently reiterated that, in so doing, "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, ___ U.S. ___, 116 S. Ct. 1657, 1663 (1996). "A trial

judge views the facts of a particular case in light of the distinctive features and events of the community; likewise a police officer views the facts through the lens of his police experience and expertise", *id.,* and must "formulate[] certain common-sense conclusions about human behavior", *Illinois v. Gates*, 462 U.S. at 231. Accordingly, "[a]n appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable." *Ornelas*, ___ U.S. at ___, 116 S. Ct. at 1663.

A.

The circumstances leading up to the Officers' presence at 2302 Bleker Street are important to understanding their subsequent actions at that location, including Officer Weston's positioning himself outside the partially-uncovered rear window, which faced the house just searched and was, in fact, only 15 feet from it.

On September 13, 1994, a confidential informant, who had provided reliable information about narcotics violations to police on at least three prior occasions, informed Officer Weston that 3717 Campbell was being used as a "crack house" by the Fifth Ward Posse, a violent criminal street gang; that he had seen several black males known to be members of the Fifth Ward Posse at the house; that he had observed an unknown black male, 19 to 20 years of age, approximately 5'6" to 5'7" tall, weighing approximately 120-125 pounds, selling crack cocaine from the house; and that he observed a "large, blue steel pistol" on the couch beside the unknown black male. Based on that information, which was contained in a warrant affidavit executed by Officer Weston, a state judge issued a search *and arrest*

warrant authorizing the search at 3717 Campbell *and the arrest* of the unknown male who was selling crack cocaine there. The appellants do not challenge that warrant or the affidavit on which it is based.

Subsequent to obtaining the search *and arrest* warrant, Officer Weston learned, as a result of a computer inquiry, that "Ricky" Thomas, a convicted felon, matched the description of the person that the informant had observed selling crack cocaine at 3717 Campbell. The Officer learned also that, two months earlier, someone had reported that two suspects, identified as "Ricky" and "Lamont", had committed an aggravated sexual assault with a firearm at 3717 Campbell.

During the execution of the warrant at 3717 Campbell, the suspect, a black male, approximately 5'6" to 5'8", wearing a white T-shirt, fled from the rear of the house. Two officers chased him, but lost sight of him. Officer Weston participated in the search of 3717 Campbell, in which the Officers discovered currency, crack cocaine, and a handgun. Officer Weston, who had over 26 years' experience as a police officer, and four years' experience with the violent gang task force, testified at the suppression hearing that, based on his experience as a narcotics officer, crack cocaine dealers often operate out of two separate locations: a "crack" or "smoke" house, at which persons can buy a $10 or $20 rock of crack cocaine and remain to smoke it; and a "stash" house, at which the largest amount of crack cocaine is kept, and at which wholesale amounts are sold to other drug dealers. He testified that 3717 Campbell was consistent with a "smoke" house.

After completing the search of 3717 Campbell, Officer Weston and several

other Officers joined the ongoing search of the neighborhood for the suspect, believed to be Ricky Thomas. During that search, they encountered Dorothy Cooksey, who lived at 2312½ Bleker (only two houses north of 3717 Campbell). Cooksey told the Officers that "Ricky" had tried to force his way into her home in order to hide from the Officers pursuing him. She identified a photograph of Thomas as "Ricky"; stated that he "would end up" at the house at the corner of Bleker and Campbell Streets (2302 Bleker, *only 15 feet from 3717 Campbell*); and stated that Ricky and "Lamont with the Afro", along with others, sold drugs at that house. Officer Weston testified that the Officers proceeded to 2302 Bleker because, based on "the total circumstances", they expected to find Thomas hiding inside the house.

As the majority notes, exigent circumstances include those for which officers reasonably fear for their safety and those for which there is a risk of a suspect fleeing or of evidence being destroyed. The majority concludes that the district court's findings of fact were clearly erroneous as to there being exigent circumstances justifying the Officers' presence at 2302 Bleker because (1) any continuous police pursuit of Thomas had ended over 30 minutes before the Officers approached 2302 Bleker; (2) there is no evidence that the inhabitants of 2302 Bleker were aware of the Officers' presence before they knocked on the door and announced their presence; (3) "[a]side from Cooksey's broad and uncorroborated statement, there was no indication that contraband would be found in the house and certainly no evidence regarding its `ready destructibility' or the risk of its removal

- 26 -

or destruction", **Op.** at 12; and (4) the Officers were unaware of any particular danger to themselves or others which might distinguish this case from any other narcotics investigation. I disagree wholeheartedly with each conclusion and address them in turn.

1.

After hearing the testimony, the district judge remarked that this was a "textbook" example of "hot pursuit". I agree. But, the majority concludes that, because "continuous police pursuit of Thomas had ended over 30 minutes before the police approached 2302 Bleker Street", this case does not involve the requisite exigent circumstance of "hot pursuit". **Op.** at 11-12 & n.21.

Officer Weston testified at the suppression hearing that only "about 25 to 30 minutes" elapsed between the time the Officers forcibly entered 3717 Campbell and the time they knocked at 2302 Bleker. Although it is true, as the majority notes, that "'hot pursuit' means some sort of a chase", *United States v. Santana*, 427 U.S. 38, 43 (1976), "it need not be an extended hue and cry in and about [the] public streets". *Id*. (brackets in original).

The Officers' pursuit of the suspect from 3717 Campbell was immediate. Although the Officers who initially pursued the suspect lost sight of him, *two or more officers continued to search for him, from the moment he fled up to and including the moment the Officers approached 2302 Bleker, about 25-30 minutes later*. Officer Weston searched 3717 Campbell for only approximately ten minutes before he rejoined the ongoing search for the suspect. Accordingly, the search for

- 27 -

Thomas involved the exigent circumstance of "hot pursuit".

2.

The majority's conclusion that there is no evidence that the occupants of 2302 Bleker were aware of the police presence before the Officers knocked on the door is implausible. Officer Weston testified at the suppression hearing that, for the search of 3717 Campbell, the Officers were dressed in police raid jackets with "Police" written across the front, and the special agents wore raid gear that identified them as "ATF" agents; that, as the Officers approached 3717 Campbell, they shouted, "Police officers. We have a search warrant"; that a door ram was used to gain entry there and the Officers "made a lot of noise getting in"; and that the back of 2302 Bleker is only approximately 15 feet from the side of 3717 Campbell.

Considering the extremely close proximity of the houses, a reasonable officer could have believed that the occupants of 2302 Bleker were well aware of the police presence in the neighborhood prior to the Officers' arrival at 2302 Bleker. Moreover, the majority overlooks the salient fact that the Officers reasonably believed that the suspect for whom they had an arrest warrant and who had recently fled 3717 Campbell was hiding inside 2302 Bleker; certainly the Officers were justified in believing that the suspect, who had recently tried to force his way into Cooksey's home to hide, was aware that they were looking for him.

3.

Brushing aside the information Cooksey gave the Officers about drug dealing

at 2302 Bleker by characterizing her statement as "broad and uncorroborated", **Op.** at 12, the majority asserts that there was no indication that contraband would be found at 2302 Bleker. It fails to give adequate weight to Cooksey's information, and ignores evidence of other relevant circumstances, including Officer Weston's experience with crack cocaine dealers' practice of maintaining both a "smoke" house and a "stash" house.

Only 10 to 15 minutes after the suspect escaped from 3717 Campbell, Cooksey, a resident of the neighborhood, identified a photograph of Thomas as the person who had just tried to break into her house while escaping from the police, and told the Officers that he "would end up" at 2302 Bleker, where he sold drugs with "Lamont with the Afro" and others. The information provided by Cooksey was corroborated, to a great degree, by Officer Weston's knowledge gleaned from the events that had occurred up to that point. Based on his computer search and information from a confidential informant, the Officer already suspected Thomas of having sold crack cocaine at 3717 Campbell a few days earlier. Having just completed the search of 3717 Campbell, the Officer had confirmed that 3717 Campbell was a "crack" house, and was aware that the suspect who fled from 3717 Campbell fit Thomas' description. He knew also that two months earlier, a sexual assault had been reported at 3717 Campbell, involving "Ricky" and "Lamont". Based on his experience in the area, which was known for gang and narcotics activity, he had observed that crack cocaine dealers frequently operated out of both a "stash" house and a "smoke" house.

In any event, there is no indication that Officer Weston had any reason to believe that Cooksey had a motive to falsify information or that she made her accusations merely to spite the occupants of 2302 Bleker. *See **United States v. Rollins***, 522 F.2d 160, 164 (2d Cir. 1975) (stating that where an informer was not an anonymous paid informer, but an identified bystander with no apparent motive to falsify, his report "has a `peculiar likelihood of accuracy'"), *cert. denied*, 424 U.S. 918 (1976); ***United States v. Unger***, 469 F.2d 1283 (7th Cir. 1972), *cert. denied*, 411 U.S. 920 (1973). Based on the totality of these circumstances, the Officers reasonably could have believed that contraband would be found at 2302 Bleker.

4.

The majority's concern over the lack of evidence regarding the "ready destructibility" of the contraband is misplaced. Our court has long recognized the common sense fact that drug trafficking evidence is subject to easy and quick removal or destruction. *See, e.g., **United States v. Rico***, 51 F.3d 495, 501 (5th Cir.) (internal quotation marks and citations omitted) (one of the factors relevant to determining whether exigent circumstances exist is "the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic"), *cert. denied*, ___ U.S. ___, 116 S. Ct. 220 (1995).

5.

Finally, the majority's assertion that the Officers were unaware of any particular danger to themselves or others which might distinguish this case from the

dangerous circumstances attending every narcotics investigation fails to take into account the totality of the circumstances of which the Officers were aware. The majority notes that, because none of the Officers saw a firearm on Thomas when he fled 3717 Campbell, and because the weapon identified by the confidential informant was seized from 3717 Campbell after Thomas had fled, the Officers' suspicion that Thomas was armed stemmed entirely from the computer report of Thomas' alleged involvement in the sexual assault two months earlier. Once again, I disagree completely.

The confidential informant who supplied the information underlying the search and arrest warrant for 3717 Campbell told Officer Weston that 3717 Campbell was being used as a "crack house" by the Fifth Ward Posse, a violent criminal street gang with which Officer Weston was familiar as a result of his participation in the ATF/HPD Violent Gang Task Force, *to which he had been assigned for four years*, during which time he investigated gang-related narcotics trafficking activities in the Fifth Ward area (in which the Campbell and Bleker Street houses were located). As our court has acknowledged often, "firearms are 'tools of the trade' of those engaged in illegal drug activities." **United States v. Ramos**, 71 F.3d 1150, 1158 n. 26 (5th Cir. 1995) (internal quotation marks and citation omitted), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1864 (1996).

Based on his experience and knowledge of gang-related narcotics trafficking, Officer Weston reasonably could have concluded that, even though the weapon described by the confidential informant was left behind when the suspect fled 3717

Campbell, the suspect had access to other weapons. This is especially true because 2302 Bleker had been reported by Cooksey to the Officers as a place where drugs were sold.

Considering the totality of the circumstances, exigent circumstances (including pursuit of a fleeing crack cocaine dealer whom the Officers had reason to believe was armed and dangerous, and for whom they had an arrest warrant, as discussed *infra*) more than justified Officer Weston's presence at the rear of 2302 Bleker. Once he reached the window there, Officer Weston knocked on it and announced that police officers wanted to talk with the occupants. Because the Officer was lawfully at the back of the house for the purpose of preventing Thomas, whom he reasonably believed to be inside, from fleeing, he did not violate the Fourth Amendment by failing to blind himself to what he could see -- to possibly include someone with a weapon ready to fire at him -- through the partially uncovered window.

It bears repeating that our review of an exigent circumstances finding is not *de novo*; we review only for clear error. A finding of fact is clearly erroneous only "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." ***Anderson v. City of Bessemer City, N.C.***, 470 U.S. 564, 573 (1985) (citation omitted).

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have

> weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.* at 573-74. With all due respect, I do not understand how anyone reading the suppression hearing record could conclude that the district court's finding was clearly erroneous.

B.

The officers had probable cause to arrest Blount and Johnson. Again, we review a probable cause ruling *de novo*; but, in so doing, we must heed the Supreme Court's admonition "to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas,* ___ U.S. at ___, 116 S. Ct. at 1663. Probable cause is a "common sense, non-technical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at ___, 116 S. Ct. at 1661 (quoting *Illinois v. Gates,* 462 U.S. at 231).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same--*and so are law enforcement*

- 33 -

> *officers*. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Gates,* 462 U.S. at 231-32 (emphasis added).

## 1.

The district court concluded that the police had probable cause to arrest Blount and Johnson for the crimes of harboring a fugitive (Thomas) and of possessing contraband. As for the former, the majority concludes that the police did not have probable cause because "[t]he police were well aware that there was no extant arrest warrant for Thomas at the time" of the arrests. **Op.** at 14. But, although there was no arrest warrant expressly naming Thomas, the majority erroneously ignores the fact that the search warrant for 3717 Campbell *is also an arrest warrant;* it authorizes the arrest of the individual, whose name was unknown at the time the warrant was issued, described in the warrant affidavit as having sold crack cocaine at 3717 Campbell. Accordingly, the Officers had a warrant to arrest the suspect who fled from 3717 Campbell when the search warrant was executed at that location less than one-half hour earlier.

Based on the totality of the circumstances, including the Officers' experience and the information provided to them by Cooksey, the Officers had probable cause to believe that the suspect was hiding inside 2302 Bleker. In light of those circumstances, as well as the refusal of the occupants of 2302 Bleker to open the door in response to requests by persons attired in clothing which clearly identified them as law enforcement officers, and who loudly announced their identity, until the arrival of uniformed officers in response to Blount's 911 call reporting a burglary in progress, the Officers had probable cause to believe that the occupants had committed the crime of harboring a fugitive.

2.

In the alternative, the majority concludes that the Officers did not have probable cause to arrest Blount and Johnson for possession of contraband because the only factual basis for that theory was the information provided by Cooksey. It states that Cooksey's "vague assertion that drugs were sold at 2302 Bleker Street was uncorroborated and bereft of detail, *i.e.* lacking in any indicia of reliability." **Op.** at 15. It claims to state

"only the uncontroversial proposition that under the 'totality of the circumstances' standard announced in **Gates** the generalized and uncorroborated statement of a 'citizen informant,' without more, is not enough." **Op. at 15 n.34.** Instead, the majority announces a new standard, casting aside a well-settled standard that has been accepted and applied both before and after **Gates**.

The majority rejects the Government's contention that an "average citizen" like Cooksey should be presumed credible, in part because the case cited by the Government in support of that proposition, **United States v. Fooladi**, 703 F.2d 180 (5th Cir. 1983), was decided under the standards of **Aguilar v. Texas**, 378 U.S. 108 (1964), and **Spinelli v. United States**, 393 U.S. 410 (1969), which were superseded by the totality of circumstances test announced in **Gates**. But, **Gates** is recognized as having replaced the **Aguilar-Spinelli** test with "a new, more flexible standard for evaluating the facial sufficiency of an affidavit based on a hearsay account of an informant's tip." **United States v. Phillips**, 727 F.2d 392, 395 (5th Cir. 1984); *see also* **Gates**, 462 U.S. at 237 n.10 (Fourth Amendment policies

"require a less rigorous standard than that which appears to have been read into *Aguilar* and *Spinelli*").  Needless to say, if an average citizen is presumptively credible under *Aguilar* and *Spinelli*, that presumption should be equally applicable, if not all the more true, under *Gates*' more flexible standard.

In *Phillips*, the defendant's wife contacted the ATF and gave a sworn statement regarding her husband's possession of a sawed-off shotgun.  The defendant argued that the warrant was not supported by probable cause because the warrant affidavit contained no information establishing the reliability of the informant.  The defendant asserted that the agent had never met Mrs. Phillips before she gave her statement, knew nothing about her from any other source, and had made no effort to corroborate her story.

Our court noted that, "[w]hen information is received from an identified bystander or victim-eyewitness to a crime, we have held that such a non-professional informant's reliability need not be established in the officer's affidavit."  *Id*. at 397 (internal quotation marks and citation omitted).

> The rationale for the victim or bystander exception is that the statements of such eyewitnesses will presumably be based on their own observations and thus are not likely to reflect idle rumor or irresponsible conjecture....
>
> ... When an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.

*Id.* at 397 (internal quotation marks and citations omitted). Although Mrs. Phillips' trustworthiness was diminished by her possible motives for vengeance (she had recently quarreled with and left her husband), her statement was in the form of an affidavit, which subjected her to possible prosecution if she lied, and her statement described in explicit detail where her husband lived, his prior criminal record, and where the gun could be found. Applying *Gates*, our court concluded that, under the totality of those circumstances, there was a fair probability that Mrs. Phillips' tip was true. *Id.* at 399.

The information provided by Cooksey to the Officers contained less detail than that provided by Mrs.

Phillips, and, unlike Mrs. Phillips' statement, Cooksey's statement was unsworn; but, on the other hand, numerous other circumstances indicate its reliability. Cooksey was a resident of the neighborhood, living only two houses away from the two houses searched, and had just been the victim of an attempted break-in by the suspect for whom the police were searching. She had no apparent motive to falsify information for the purpose of revenge or spite. And, her statement contains far more detail than the majority acknowledges: she identified Thomas' photograph as that of the person who had tried to break into her home; described 2302 Bleker as the location where the suspect would "end up"; and explained that the suspect would go there because he sold drugs at that location with "Lamont with the Afro".

Moreover, contrary to the majority's assertion, Cooksey's statement about drug-dealing activity at 2302 Bleker was not the only factual basis for the Officers' theory that the occupants of 2302 Bleker possessed contraband. That theory was also supported by the Officers' belief that the suspect who had fled 3717 Campbell, in which the Officers found crack cocaine,

cash, and a weapon, was hiding inside 2302 Bleker, and the Officers' experience in gang-related narcotics trafficking investigations in the area, including Officer Weston's knowledge that crack cocaine dealers frequently utilize both a "smoke" house and a "stash" house from which to conduct their business. Under the totality of the circumstances, the Officers also had probable cause to arrest the occupants of 2302 Bleker for possession of contraband.

## C.

Because there was probable cause to arrest Blount and Johnson, both for harboring a fugitive and for possession of contraband, the protective sweep of 2302 Bleker, incident to the arrests, did not violate the Fourth Amendment. For the same reasons, Blount's post-arrest statement was not the product of an unlawful arrest. Accordingly, the majority also erroneously excised from the warrant affidavit for 2302 Bleker the information about the Officers' protective-sweep discovery of the razor blade containing cocaine residue, and Blount's statement.

## III.

For the foregoing reasons, there was probable cause for the issuance of the search warrant for 2302 Bleker; therefore, the motions to suppress were correctly denied. Accordingly, I dissent respectfully from the majority's holding otherwise.