**John Adams CARDENAS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–01–00669–CR.**

Court of Appeals of Texas,
San Antonio.

July 2, 2003.

Suzanne M. Kramer, San Antonio, for Appellant.

Mary Beth Welsh, Asst. Crim. Dist. Atty, San Antonio, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by SARAH B. DUNCAN, Justice.

John Adams Cardenas appeals the judgment convicting him of capital murder and sentencing him to life imprisonment. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

During the evening of March 12, 1999, Carolina Castillo visited in her apartment with neighbors from her complex, Carlos and Carless. While Carolina and Carless baked a birthday cake, Carlos stood out on the apartment's balcony. While there, he saw another neighbor in the complex, "Gizmo," pass by. After Gizmo said hello, Carlos introduced him to Carolina. Gizmo stayed at Carolina's apartment for approximately forty-five minutes.

Later that night, Gizmo had a party in his apartment—A306. Approximately ten people stayed up late drinking; and some, including Gizmo, also did cocaine. During the party, Gizmo passed around a gun. All of the male guests held the gun; and one of the partygoers, Joe Flores, put the gun in his waistband. When Gizmo asked for it back, Flores returned the gun; and Gizmo practiced loading and unloading it. Eventually everyone left the party except Flores and another guest, Celso Montañez, who were unable to leave because their vehicle had a flat tire. At approximately 4:00 a.m., Flores and Montañez passed out in A306. At about the same time, Gizmo

and a neighbor who had been at the party, Brandon Mediros, went to Mediros' apartment to watch television and drink beer. Gizmo told Mediros that he missed his girlfriend and that he wanted to "bone a chick." According to Flores, Gizmo returned to A306 at approximately 7:00 a.m., put on a flannel shirt, and left again. At approximately 8:00 a.m., Gizmo returned to A306, went into the bedroom, and then left again, carrying some boots.

The morning after the party, at approximately 7:45 a.m., Carolina went downstairs to Carlos and Carless' apartment and knocked on the door. Carolina, who had not attended Gizmo's party, was up early to give Carless a ride to pick up her paycheck. Carolina's knock awakened Carless, who answered the door and said she would take a shower, get dressed, and come up to Carolina's apartment in a few minutes. Carolina told Carless and Carlos that Gizmo was upstairs in her apartment and making her uncomfortable. Carlos told Carolina that Gizmo was harmless and to just tell him to leave.

Approximately ten minutes later, when Carless went to Carolina's apartment, she saw thick black smoke through the windows and found the doorknob hot to the touch. Carless yelled for help; and a neighbor called the fire department. Carless and the neighbor yelled for Carolina but got no response. Carlos, who had joined Carless, also tried to enter Carolina's apartment but the smoke was too thick. At 8:10 a.m., the Balcones Heights Fire and Police Departments arrived. When the firemen entered Carolina's apartment, they discovered a mattress on fire in her bedroom. They removed the mattress and found Carolina, unconscious on the bedroom floor and dressed in only a tee shirt. Alive but nonresponsive, Carolina was carried out by the emergency

medical technicians, who discovered she had suffered a gunshot wound to the left side of her head. Carolina died in the hospital later that day.

Carlos and Carless informed Balcones Heights Police Officer Danny Tumlinson that Gizmo had been in Carolina's apartment immediately before the fire. Carlos also told Tumlinson that he did not believe Carolina had a gun in her apartment but there had been one at the party at Gizmo's apartment the night before. The couple then directed Tumlinson to Gizmo's apartment. Tumlinson and two other officers knocked loudly on the door to Gizmo's apartment but received no answer and returned to the crime scene.

When Balcones Heights Police Chief Menn arrived on the scene, he was approached by the apartment complex security guard, Billy Reyes. Reyes informed Menn that a black truck with a flat tire in the parking lot belonged to someone inside the apartment identified by Carless and Carlos as Gizmo's; and "the guys they were looking for earlier" were still there, peeping out of the blinds of a window at the front of Gizmo's apartment from which there was a clear line of sight to Carolina's apartment. At approximately 11:00 a.m., Chief Menn and Officers Tumlinson and Menchaca returned to Gizmo's apartment and knocked loudly. Someone peeped out of the blinds again. Eventually, Montañez opened the door; Flores was still asleep on the couch. When the officers asked Montañez if either he or the man on the couch were Gizmo, Montañez responded "no" and stated that neither of them lived in the apartment. The officers asked for identification; and Montañez turned around to retrieve his wallet. Chief Menn, sensing danger in the situation, told him to stop and asked if they could look in the apartment for Gizmo. Montañez said yes, so Chief Menn and Officer Menchaca walked

to the rear of the small apartment, checked the closet, and determined there was no one in the apartment other than the men who identified themselves as Montañez and Flores. The officers then returned to the front of the apartment and asked Montañez and Flores if they would accompany them to the police station and give statements. Montañez and Flores agreed and began to dress.

According to Chief Menn, he ordered Officer Menchaca to follow Montañez around the apartment as he dressed for "officer safety." Montañez sat down on the floor near the vanity area and started to put on some nearby boots. He then held up the boots and said "[t]hese aren't my boots, Gizmo took my boots." When Montañez held up the boots, Officer Menchaca saw what he believed to be a blood stain on the sole of one of the boots. Montañez then walked into the bathroom. Officer Menchaca followed and saw a spent shell casing standing upright in the toilet bowl. At that point Officer Menchaca informed Chief Menn that "there was evidence in the apartment." Chief Menn then ordered everyone out and assigned Officer Menchaca to guard the apartment until a search warrant was obtained. It took the remainder of the afternoon to determine that "Gizmo" was in fact John Adams Cardenas and to obtain a search warrant for Cardenas' apartment.

The warrant was executed at 5:00 p.m. that afternoon. The search of Cardenas' apartment yielded a revolver, ammunition, and a spent shell casing fired from the revolver. Also recovered were the boots; the tissue and blood on the sole of one of the boots is consistent with Carolina's DNA profile. Material was also taken from inside the boots; tests of this material established only that Cardenas could not be excluded as the donor. In Carolina's apartment, the police found blood stains on

the carpet and walls in the living, kitchen, bathroom, and vanity areas. Also found on Carolina's bedroom floor were a pair of bloody pants, panties, and a tennis shoe. The pants were inside out with the panties in the position they would be in if both were taken off at the same time. The tennis shoe was stuck inside the right pant leg. Footprints in the blood on the floor showed someone with one shoe and one sock walking in circles. Carolina had scratches on the front of her right thigh and right knee consistent with fingernail scratches. A bullet fragment removed from her head matched the gun found in Cardenas' apartment. Expert medical testimony established that, judging from the wound, the gun was fired from a point more than two, and possibly as far as eight to ten feet away. A palm print on the inside of the door frame matched Cardenas'.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

In his fifth and sixth points of error, Cardenas argues the evidence is legally and factually insufficient to support his conviction. We disagree.

### Standard of Review

"A legal sufficiency review calls upon the reviewing court to view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Mason v. State*, 905

S.W.2d 570, 574 (Tex.Crim.App.1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 670 (1996). In reviewing the factual sufficiency of the evidence, we " 'view[ ] all the evidence without the prism of "in the light most favorable to the prosecution," [i.e., view[ ] the evidence in a neutral light,] and set[ ] aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.' " *Johnson*, 23 S.W.3d at 6–7 (quoting *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996)).

### Discussion

■ Cardenas argues the evidence is legally and factually insufficient to support the jury's verdict because the physical evidence seized from his apartment and Carless' and Carlos' testimony regarding Carolina's statements were inadmissible. However, in reviewing the sufficiency of the evidence, "a reviewing court must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider." *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App.1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994). We therefore overrule Cardenas' fifth and sixth points of error.

### MOTION TO SUPPRESS

In Cardenas' first point of error, he argues the trial court erred in denying his motion to suppress the physical evidence seized from his apartment because the police officers' warrantless entry into his apartment violated his rights under the Fourth Amendment to the United States Constitution.[1] We disagree.

---

1. Cardenas also argues the warrantless search violated article I, section 9 of the Texas Constitution; and, in his brief, Cardenas states, "Texas affords greater constitutional protections on [sic] its citizens than the minimum

standards required by the federal constitution." However, he does not distinguish the federal and state constitutional protections, nor does he provide substantive analysis of the separate grounds. Because he fails to

## Standard of Review

We review a trial court's suppression ruling under the abuse of discretion standard. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Under this standard, we review de novo the trial court's resolution of mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Id.* But we afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the findings are based on an evaluation of credibility and demeanor. *Id.* When the trial court does not make explicit findings of historical fact, "we review the evidence in a light most favorable to the trial court's ruling." *Walter v. State*, 28 S.W.3d 538, 540 (Tex.Crim.App.2000).

## Discussion

The Fourth Amendment permits the warrantless seizure of evidence that is in "plain view." *See Walter*, 28 S.W.3d at 541. "[The] 'plain view' doctrine requires only that: (1) law enforcement officials have a right to be where they are, and (2) it be immediately apparent that the item seized constitutes evidence." *Id.* Since it is indisputable that it would be "immediately apparent that the item[s] seized"— the bloody boot, the revolver, and the shell casing—"constitute[ ] evidence," *see id.*, the legality of the search of Cardenas' apartment rests upon whether the officers had "a right to be where they [were]."

"A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir.), *cert. denied*, 534 U.S. 861, 122 S.Ct. 142, 151 L.Ed.2d 94 (2001). Here, the trial court ruled that Montañez had authority to consent to the officer's warrantless entry into Cardenas' apartment. We cannot agree. At best, Montañez was merely a casual overnight guest. Consequently, he did not have actual authority to consent to the officer's entry. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Nor can the trial court's ruling be upheld under the doctrine of "apparent authority"; a finding of "apparent authority" is precluded by the fact that Montañez told the officers neither he nor Flores lived in the apartment. *See Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)."The trial court's reasoning is irrelevant, however, so long as *any* theory articulated by the State supports the legality of the search." *Brimage v. State*, 918 S.W.2d 466, 479 (Tex.Crim.App.1994), *cert. denied*, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 66 (1996).[2] We must therefore consider the trial court's denial of Cardenas' motion to suppress in light of the other theory articulated by the State in the trial court: the officers' entry into Cardenas' apartment was lawful under the doctrine of exigent circumstances.

distinguish and make an argument under the Texas Constitution, we will only analyze whether his federal constitutional rights were violated. *See Heitman v. State*, 815 S.W.2d 681, 690 n. 23 (Tex.Crim.App.1991).

2. At the pretrial suppression hearing the State argued that Montañez consented to the entry and that the officers' knowledge and the circumstances justified an entry for officer safety. We consider this argument to have raised

exigent circumstances; but in any event, "[i]t is well settled that a Court of Appeals can affirm a trial court's decision on a legal theory not presented to the trial court without violating 'ordinary notions of procedural default.' " *Hailey v. State*, 87 S.W.3d 118, 121 (Tex.Crim.App.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 2218, 155 L.Ed.2d 1111 (2003).

■ "Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed." *United States v. Blount*, 123 F.3d 831, 837 (5th Cir.1997), *cert. denied*, 522 U.S. 1097, 118 S.Ct. 895, 139 L.Ed.2d 881 and 522 U.S. 1138, 118 S.Ct. 1101, 140 L.Ed.2d 155 (1998). "The exigent circumstances analysis focuses upon the reasonableness of the officers' investigative tactics leading up to the warrantless entry." *Id.* at 838. In determining whether exigent circumstances exist, "[w]e apply an objective standard of reasonableness ..., taking into account the facts and circumstances known to the police at the time of the search." *Colburn v. State*, 966 S.W.2d 511, 519 (Tex.Crim.App.1998). Thus, the determination of whether exigent circumstances exist is "essentially a factual one." *Blount*, 123 F.3d at 837. Therefore, "[i]f 'reasonable minds may differ' the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Id.* at 838.

■ Here, the officers had been informed that a violent crime had been committed—Carolina had been shot in the head and her apartment set on fire; "Gizmo," who lived in apartment A306 in the same apartment complex as Carolina, had not only been in Carolina's apartment shortly before she was shot but had made her "uncomfortable"; and "Gizmo" had kept the gun that was passed around at the party in his apartment the night before Carolina was shot. The officers also knew the location of apartment A306 and thus could see that the front window of apartment A306 had a clear line of sight to Carolina's apartment; and they had been informed that someone in apartment A306 had peeked out of the blinds as the officers approached. Significantly, however, at this point in their investigation, none of the officers knew the real name of "Gizmo." Thus, as Chief Menn testified, their purpose in knocking on Cardenas' door was to make contact with "Gizmo" and determine whether he had any information concerning Carolina's injuries—a classic "knock and talk" strategy, which the "[f]ederal courts have recognized ... as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *Jones*, 239 F.3d at 720. Of course, Montañez told the officers that neither he nor Flores was "Gizmo"; and both men offered identification. But Montañez' and Flores' identification would have resolved nothing since none of the officers knew Gizmo's real name. And, as Officer Tumlinson testified, although they "knew there was a gun involved," they "didn't know where the gun was; didn't know if—[Flores] may have been sleeping with the gun tucked in the couch."

■ We begin our analysis by presuming, as we must, that the warrantless entry into Cardenas' apartment was unreasonable. But that is indeed merely the beginning, not the end, of our analysis because the touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). We are further mindful that the Court "[has a] long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application"; "[e]ach case is to be decided on its own

facts and circumstances." *Ker v. California,* 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Here, the intrusion, albeit into a private home, was minimal—the officers merely walked through the apartment, opened the closet door to ensure that an armed Gizmo was not lying in wait, and followed Montañez while he dressed to go to the station.[3] And this level of intrusion was necessary to promote a legitimate government interest—the officers' safety while Montañez and Flores retrieved their identification and dressed to go to the station to give their statements. In short, we cannot fault the officers for their warrantless entry into Cardenas' apartment because—in light of the violent crimes committed in Carolina's apartment, the officers' knowledge that Gizmo was in possession of a firearm the previous night, and the absence of information regarding the actual identity of "Gizmo",—it was objectively reasonable for Chief Menn to believe, as he testified, that "officer safety" required him to follow Montañez when he turned back into the apartment for his identification and to order Officer Menchaca to follow Montañez as he dressed. We therefore hold that, in light of the surrounding facts and circumstances, the officers' warrantless entry into Cardenas' apartment was reasonable and not violative of the Fourth Amendment. Cardenas' first point of error is overruled.

### Hearsay

In his second point of error, Cardenas argues the trial court erred in admitting Carless and Carlos' testimony that Carolina told them Gizmo was upstairs in her apartment and making her "uncomfortable" because Carolina's out-of-court statements were inadmissible hearsay. In response, the State argues the statements were admissible under exceptions to the hearsay rule. We agree.

### Standard of Review

 Whether to admit an out-of-court statement under an exception to the general hearsay rule is committed to the trial court's discretion. *See Lawton v. State,* 913 S.W.2d 542, 553 (Tex.Crim.App. 1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996). A trial court abuses its discretion in the context of evidentiary rulings only if its ruling is "outside the zone of reasonable disagreement." *Salazar v. State,* 38 S.W.3d 141, 153–54 (Tex.Crim.App.), *cert. denied,* 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001).

### Discussion

 Carolina made two statements to Carless and Carlos: (1) Gizmo is in my apartment; and (2) Gizmo is making me uncomfortable. Like the State, we analyze each separately. Carolina's first statement described an ongoing condition—Gizmo being in her apartment. Rule 803(1) of the Texas Rules of Evidence provides that "[a] statement describing or explaining ... [a] condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded by hearsay rule. Tex.R. Evid. 803(1). The record does not reflect how long it took to walk from Carolina's apartment to Carless' and Carlos' apartment, but it does reflect the two apartments were in close proximity and suggests the walk from one to the other was at best one minute. Given the close proximity between the two apartments, it is apparent Carolina's first statement was made immediately after the con-

---

**3.** *See United States v. Wilson,* 306 F.3d 231, 239–41 (5th Cir.2002) (discussing requirement for clothing as exigent circumstance), *cert. denied,* —— U.S. ——, 123 S.Ct. 1371, 155 L.Ed.2d 211 (2003).

dition was perceived. We therefore hold Carolina's first statement that Gizmo was upstairs in her apartment qualifies as a present sense impression because it was a statement describing a condition—Gizmo being in Carolina's apartment—made by Carolina immediately after she perceived it. *See Rabbani v. State*, 847 S.W.2d 555, 560 (Tex.Crim.App.1992) (holding that statement that declarant saw defendant outside was admissible under Rule 803(1) because the statement explained an event or condition), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 731 (1993). Therefore, the trial court did not err in admitting Carless' and Carlos' testimony regarding Carolina's first statement.

 Carolina's second statement described her emotional response to the condition she described. Rule 803(3) provides that "[a] statement of the declarant's then existing state of . . . emotion" is not excluded by the hearsay rule. Tex.R. Evid. 803(3). Thus, a victim's statement regarding her emotional response to a particular person qualifies as a statement of then existing state of emotion under Rule 803(3). *See, e.g., Martinez v. State*, 17 S.W.3d 677, 688 (Tex.Crim.App.2000) (holding trial court did not err in admitting victim's statement that she was afraid of man with same first name as defendant because statement admissible under Rule 803(3)). We therefore hold the trial court did not err in admitting Carless' and Carlos' testimony regarding Carolina's statement that Gizmo was making her uncomfortable. Because the trial court did not abuse its discretion in admitting Carless' and Carlos' testimony regarding Carolina's statements, we overrule Cardenas' second point of error.

 In his third point of error, Cardenas argues the trial court erred in admitting Brandon Mediros' testimony that Cardenas told Mediros that he wanted to "bone a chick." However, Cardenas' statement is an admission by a party-opponent and thus not hearsay under Rule 801(e)(2). Moreover, Cardenas failed to object to the testimony at trial and thus did not preserve the issue for appeal. *See* Tex.R.App. P. 33.1.

## THE JURY CHARGE—LESSER INCLUDED OFFENSES

In his fourth point of error, Cardenas argues the trial court erred in refusing to instruct the jury on the lesser included offenses of manslaughter and criminally negligent homicide. We disagree.

 "To determine whether a charge on a lesser-included offense should be given, [the Court of Criminal Appeals] has implemented a two-step test." *Feldman v. State*, 71 S.W.3d 738, 750 (Tex.Crim.App. 2002). "The first step is to decide whether the offense is actually a lesser-included offense of the offense charged." *Id.* "The second step of the . . . test requires that the record contain some evidence that would permit a rational jury to find that the defendant is guilty *only* of the lesser offense." *Id.* (emphasis in original).

 The jury was instructed on the law of capital murder, aggravated sexual assault, and murder. Both manslaughter and criminally negligent homicide are lesser included offenses of murder. *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex.Crim. App.2000). However, there is no evidence from which a jury could have found Cardenas, if guilty, was guilty only of manslaughter or criminally negligence homicide. Cardenas' defensive theory was that he did not shoot Carolina and was not even in her apartment the morning she was shot. This defensive theory does not permit an inference that Cardenas was reckless or negligent in causing Carolina's death. Because the record contains no

evidence that would permit the jury to find Cardenas guilty only of manslaughter or criminally negligent homicide, we overrule his fourth point of error and affirm the trial court's judgment.