

## NUMBER 13-16-00398-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

CORNELIO CASTELLANOS,                                                 **Appellant,**

**v.**

THE STATE OF TEXAS,                                                    **Appellee.**

### On appeal from the 428th District Court
### of Hays County, Texas.

# MEMORANDUM OPINION
### Before Chief Justice Valdez and Justices Rodriguez and Benavides
### Memorandum Opinion by Justice Benavides

Appellant Cornelio Castellanos challenges his Hays County conviction for aggravated assault with a deadly weapon, a second-degree felony.[1] TEX. PENAL CODE ANN. § 22.02(a)(2) (West, Westlaw 2017 through 1st C.S.). By three issues, Castellanos argues that the trial court erroneously allowed hearsay evidence that provides the only

---

[1] This cause is before the Court on transfer from the Third Court of Appeals in Austin pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN § 73.001 (West, Westlaw through 2017 1st C.S.). Because this is a transfer case, we apply precedent of the Third Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

basis for his conviction and that he was entitled to a jury instruction limiting the uses of impeachment evidence. We affirm.

## I. BACKGROUND

Castellanos's conviction arises from a domestic altercation at the home of Rosa Cortez, Castellanos's common-law wife. According to Cortez's testimony, she lived in a four-bedroom rented house with her son Francisco Figueroa, his partner Diana Gomez, her grandson, and her teenage daughter. Before June 1, 2015, Castellanos lived there for three or four years. Cortez also regularly rented a room to other people.

Cortez worked with Antonio Yaya at a restaurant in Dripping Springs. Yaya was looking for a room to rent. He and Cortez agreed that Yaya would rent a room from Cortez. Yaya explained that the first night he spent at the house, he arrived after his shift from another job sometime after 11 p.m. and went to bed. When Yaya arrived at the house, Castellanos was not present.

Yaya's trial testimony described the events he witnessed and heard. He awoke around 3:30 a.m. when the door to his bedroom was kicked in and fell to the floor. Yaya heard a loud commotion and Castellanos screaming, "What's going on?" Yaya described Castellanos as drunk. Cortez's son Figueroa was trying to keep Castellanos out of Yaya's bedroom. Yaya placed the door back in the doorway and closed it in an effort to go back to sleep. The argument outside his door continued and appeared to be escalating. Yaya thought he heard the sound of blows being exchanged. He heard Cortez and Gomez screaming and yelling. Yaya opened his door because the noise appeared to be coming closer to his room. At one point, Cortez yelled to Yaya to call 911, which he did. While

2

Yaya was on the phone, Castellanos left the house and was gone by the time the Hays County Deputy Sheriffs arrived.

Yaya speaks both English and Spanish. The members of Cortez's household only speak Spanish; the responding police officers spoke only English. The officers used Yaya to translate during the investigation. Cortez was visibly shaking and appeared to Yaya to be scared. Yaya heard Cortez tell one of the officers that Castellanos threatened her and Yaya with a machete. Yaya saw that Cortez was still shaking and appeared to be nervous from the events of the early morning when she was talking with the officers. Figueroa was also shaking when the police arrived. While Yaya while he was on the telephone with 911, Cortez told Yaya that Castellanos threatened her with a machete. Yaya did not see the machete in Castellanos's hands, but saw the machete when it was handed to the police officers who responded to the 911 call.

At trial, Cortez testified that Castellanos came home drunk early the morning of June 1, 2015. Cortez wanted him out of the house and enlisted Figueroa to get him out. According to Cortez's testimony, Castellanos did not threaten anyone with a machete. The machete was in the house because Figueroa was going to use it on the lawn. The State played excerpts of videotape and the 911 call taken early June 1, 2015 that contradicted Cortez's testimony. On the videotape Cortez was asked, "Did he threaten you?" and she responded through Yaya, "Yes, that he was going to kill me if [Yaya] did not leave the house immediately." Earlier on the tape, Cortez said Castellanos had a machete. Before the State played the videotape, defense counsel objected. The trial court overruled the objections, and the evidence was admitted, subject to the trial court's limiting instruction that the evidence be used only for impeachment purposes.

3

Figueroa testified that his mother woke him about three a.m. on June 1, 2015 and asked for his help with Castellanos. "She was very nervous, and she was scared." She said she wanted me to get Castellanos out of the house; he was drunk. He was in her bedroom, and I went in and grabbed him to take him out of the house. Figueroa denied that Castellanos assaulted anyone but testified that his mother "was very scared. She thought he was going to assault her, so that's why she called me."

Figueroa denied speaking to Yaya that night, and testified that the door to Yaya's bedroom was broken before that night, "It never worked." Figueroa did not know who called 911, he thought it was his mother or Gomez.

Figueroa recalled speaking to the police when they responded to the 911 call and that Yaya translated. He also acknowledged speaking to a detective later that morning, but Figueroa denied that he had a butcher knife in his hand later that morning when the Sheriff's deputy came. Figueroa further denied that he told the deputy he feared Castellanos had returned.

Detective Manuel De La Rosa from the Hays County Sheriff's Department testified that he went to Cortez's house around 10:00 a.m. on June 1, 2015, to follow up on the early morning incident and 911 call. He wanted to make sure everyone was safe, and he was the only Spanish speaker in the department. Detective De La Rosa described what he saw and the events at the house. He knocked on the door several times but initially did not see any movement in the house. A child approached the door, and Detective De La Rosa conveyed to the child that he wanted to speak to an adult. According to Detective De La Rosa, Figueroa came out of the bedroom with a butcher knife in his hand and looked scared. When Figueroa realized that Detective De La Rosa was an officer, he put the

4

knife down and came to the door. Figueroa said he thought Castellanos had returned, and he was afraid. Defense counsel objected before this testimony. The trial court heard the evidence outside the jury's presence and overruled the defense objection to hearsay. Detective De La Rosa's testimony was repeated before the jury.

Gomez testified that she loved Castellanos as if he were her father-in-law. On June 1, 2015, she was awakened when Cortez knocked on their door. Cortez was scared because they had not seen "[Castellanos] . . . aggressive. He was upset. He was jealous." She described Castellanos as "a very good person" but acknowledged they were all scared because they "had never seen him that way . . . . He was drunk and he was like jealous . . . because [Cortez] was renting the room to a co-worker." Gomez explained that the door to Yaya's room fell into the room because Castellanos, Figueroa, and she fell into it while she and Figueroa were trying to hustle Castellanos out of the house. Gomez testified that the machete was in Cortez's bedroom that morning, although it was usually kept in Castellanos's truck.

The jury found Castellanos guilty on one count of aggravated assault against Cortez and found Castellanos guilty of the lesser included count of assault by threat as to Figueroa. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2) (West, Westlaw through 2017 1st C.S.). Castellanos elected punishment by the trial court. During sentencing, Cortez testified that Castellanos was her husband, but then clarified that they were a couple, but never married. She asked the trial court to give him a minimum sentence, "As little as possible. Two years, at most. . . . Because he didn't do anything bad. He didn't attack me, he didn't attack anyone." During sentencing, defense counsel argued that Castellanos had an alcohol problem as evidenced by his numerous previous convictions

for DWI. The State argued that his previous convictions and his several illegal entries into the United States exemplified his lack of respect for law and argued for more than the minimum sentence. The trial court imposed a four-year sentence in the Texas Department of Criminal Justice–Institutional Division on count one and time served on count two.

## II. HEARSAY

Castellanos argues in his first two grounds that the trial court abused its discretion in admitting two hearsay statements during trial over defense objection. He argues that the hearsay was harmful because it provided the only evidence of elements of the crime for which Castellanos was convicted.

### A. Standard of Review

Hearsay is a statement other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is not admissible except as provided by statute or the rules of evidence. *Id.* 802. An appellate court reviews a trial court's evidentiary ruling for abuse of discretion and will not reverse that decision absent an abuse of discretion. *See Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Epps v. State*, 24 S.W.3d 872, 879 (Tex. App.—Corpus Christi 2000, pet. ref'd). "The trial court abuses its discretion when [its] decision lies outside the zone of reasonable disagreement." *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008).

To preserve error for appellate review, the record must show that (1) the complaining party made a timely and specific request, objection, or motion; and (2) the trial judge either ruled on the request, objection, or motion (expressly or implicitly), or he

refused to rule, and the complaining party objected to that refusal. *See* TEX. R. APP. P. 33.1(a); *Jaynes v. State*, 216 S.W.3d 839, 850 (Tex. App.—Corpus Christi 2006, no pet.).

### B.    Excited Utterance

At trial, Yaya testified that Cortez stated that Castellanos threatened to kill her with a machete. Castellanos argues that the trial court abused its discretion in allowing that testimony. The State argued that the statement qualified as an excited utterance.

An excited-utterance is a recognized exception to the hearsay rule. TEX. R. EVID. 803(2). The exception applies to "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *McCarty*, 257 S.W.3d at 239. Over defense objection, Yaya testified that Cortez told him and later told the investigating officer that Castellanos threatened to kill her and Yaya with a machete. Cortez made the statements both while Yaya was on the phone with the 911 operator and again later when the police arrived, and he was translating for them. The trial court overruled the hearsay and confrontation objection made by defense counsel. Yaya testified regarding Cortez's demeanor when she first made the statement while Yaya was calling the 911 operator. He described her as "yelling and screaming." When she related the statement to the police officer a "few minutes later," Yaya described Cortez as "still stressed about the situation," "nervous," and "definitely shaking." In addition, Figueroa and Gomez testified that while Castellanos was in the house, Cortez was very scared.

"In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question." *Zuliani*, 97 S.W.3d at 595. "The basis for the excited utterance exception is a

7

psychological one, namely, the fact that when a [person] is in the instant grip of violent emotion, excitement or pain, [s]he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the truth will come out." *Id.* (emphasis in original) (internal quotations omitted). Thus, a reviewing court must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964). Based upon Yaya, Figueroa, and Gomez's description of Cortez's demeanor at the time she made both statements, the trial court did not abuse its discretion in admitting Yaya's testimony that he heard Cortez say that Castellanos was threatening to kill her with a machete as an excited utterance. Castellanos's first issue on appeal is overruled.

### C. Present Sense Impression

Defense counsel objected to Detective De La Rosa's testimony that Figueroa had a butcher knife in his hand and told the detective that he feared that Castellanos had returned to the house. The trial court allowed the testimony as a present sense impression.

A statement of a present sense impression by a witness is admissible as an exception to hearsay. TEX. R. EVID. 803(1). Such a statement describes or explains an event made while or immediately after the declarant perceived it. *Id.* "The rationale for the exception is that the contemporaneity of the statement with the event that it describes eliminates all danger of faulty memory and virtually all danger of insincerity." *Fischer v. State*, 252 S.W.3d 375, 380 (Tex. Crim. App. 2008). However, a present sense impression statement must be made during the event. Detective De La Rosa testified that Figueroa

8

was calm and appeared to have had time for calm reflection when they spoke several hours after the altercation. Figueroa's statement to the detective of his fear does not qualify as a present sense impression. However, if the trial judge's decision is correct on any theory of law applicable to the case, it will be sustained even when the trial judge gives the wrong reason for his decision. *See State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

Figueroa's statement that he was afraid Castellanos had returned was a statement of his then-existing emotional state. A statement of then-existing mental, emotional, or physical condition is also a hearsay exception. TEX. R. EVID. 803(3). In *Williams v. State*, a deputy was permitted to describe a declarant who was frightened of her attacker and her statement to the deputy about her fear. 798 S.W.2d 368, 371 (Tex. App.—Beaumont 1990, no pet.). "[A] victim's statement regarding [his] emotional response to a particular person qualifies as a statement of then existing state of emotion under Rule 803(3)." *Cardenas v. State*, 115 S.W.3d 54, 63 (Tex. App.—San Antonio 2003, no pet.) (holding that the trial court did not abuse its discretion in admitting declarant's statement that defendant made her uncomfortable). Similarly, in *McDonald v. State*, the court held that the trial court did not abuse its discretion in permitting testimony that the declarant changed her locks to protect herself from her husband. 911 S.W.2d 798, 806 (Tex. App.—San Antonio 1995, pet. dims'd); *see also Vann v. State*, 853 S.W.2d 243, 253 (Tex. App.—Corpus Christi 1993, pet. ref'd) (holding that declarant's statement "that he was not happy in his current marriage and wanted to find a way out and Cherie was visibly upset with him and wouldn't give him the divorce he wanted" qualified as a statement of emotional state). We conclude that the trial court did not abuse its discretion in admitting evidence of

9

Figueroa's then state of mind—fear of Castellanos. Accordingly, we overrule Castellanos's issue on appeal.

### III. JURY CHARGE ERROR

Castellanos argues in his third issue that the trial court should have given his requested limiting instruction in the jury charge. He claims that the court's failure to do so harmed him.

#### A. Standard of Review

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). Next, the court must determine whether harm resulted from the error that requires reversal. *Mann v. State*, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998); *see Benn v. State*, 110 S.W.3d 645, 648 (Tex. App.—Corpus Christi 2003, no pet.). Once an appellate court finds jury-charge error, it applies one of the two following standards of review: "Where there has been a timely objection made at trial, an appellate court will search for only 'some harm.' By contrast, where the error is urged for the first time on appeal, a reviewing court will search for 'egregious harm.'" *Mann*, 964 S.W.2d at 641 (quoting *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994)). Harm must be assessed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Abdnor*, 871 S.W.2d at 733.

A trial court may not single out certain testimony and comment on it in the jury charge. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West, Westlaw 2017 through 1st

C.S.); *Chambers v. State*, 700 S.W.2d 597 (Tex. Crim. App. 1985). The jury charge should state the "law applicable to the case, without expressing or intimating any opinion as to the weight of the evidence, or the credibility of the statements made by the party accused or by the witnesses." *Henry v. State*, 149 Tex. Crim. 321, 323, 194 S.W.2d 264, 265 (1946); *see also Rodriguez v. State*, No. 13-08-095-CR, 2009 WL 1567341 at *3 (Tex. App.—Corpus Christi Feb. 26, 2009, pet. ref'd) (mem. op., not designated for publication). To determine whether an instruction is a comment on the weight of the evidence, the reviewing court is required "to assess the probable effect of the instruction on the jury in the context in which it was given." *O'Connell v. State*, 17 S.W.3d 746, 748 (Tex. App.—Austin 2000, no pet.) (quoting *Russell v. State*, 749 S.W.2d 77, 79 (Tex. Crim. App. 1988)).

## B. Discussion

At the time the State's videotape exhibits and translation were admitted and used with Cortez, the trial court gave the following limiting instruction to the jury: "If the jury considers this evidence, and it is always the jury's prerogative of what evidence it may consider; if it does in this case, the jury can only consider this evidence for impeachment." State's counsel questioned Cortez regarding the statements she made on the video. She testified she did not recall making the statements. She further testified she did not remember because she was scared, not because Castellanos threatened her, but because of his aggressive attitude.

After the charge conference, defense counsel requested an instruction limiting the use of prior inconsistent statements. "I would ask to be put in the Jury Charge is the prior inconsistent statements. The fact that the jury be instructed that prior inconsistent statements are to only be used for impeachment purposes, not as substantive evidence."

The State responded that it would be difficult to give such an instruction because some evidence was allowed as an exception to the hearsay rule and not as an inconsistent statement for impeachment.[2] The trial court denied defendant's request, "I believe that would be a comment on the evidence. And I also believe that the rights of the defendant have been protected, based on the Court's instruction." Defense counsel wrote a proposed instruction[3] and submitted it to the trial court which then ruled, "The Court has reviewed the requested jury instruction with regard to prior inconsistent statements and that has, in fact, been overruled."

During closing, defense counsel reminded the jury about prior inconsistent statements and how they are to be used only for impeachment. When the State discussed the video and the transcript/translation of the video, it emphasized the discrepancies between Cortez's statements on the witness stand and her statements the night of the altercation. The State argued that she and other family members lied at trial about the events to protect Castellanos.

Because we presume that the jury followed the trial court's limiting instructions at the time the evidence was admitted, we do not find jury charge error.[4] Although the presumption is refutable, the appellant must rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Castellanos has not pointed to any such proof.

Castellanos's third issue is overruled.

---

[2] The two exceptions to hearsay discussed previously were properly used as substantive evidence.

[3] The proposed instruction read: "You have heard testimony of prior inconsistent statements. Such testimony is to be used for impeachment purposes only, not as substantive evidence."

[4] *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (holding that a jury is presumed to follow a limiting instruction).

12

## IV. Conclusion

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
16th day of August, 2018.