## UNITED STATES of America

v.

## Gerardo TREJO, Defendant.

## No. EP–06–CR–2506–PRM.

United States District Court,
W.D. Texas,
El Paso Division.

March 7, 2007.

Eduardo Solis, Law Offices of Eduardo Solis, Marie Romero–Martinez, Asst. Federal Public Defender, El Paso, TX, for Defendant.

Kristal Melisa Wade, U.S. Attorney's Office, El Paso, TX, for United States of America.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

MARTINEZ, District Judge.

On this day, the Court considered Defendant Gerardo Trejo's "Motion to Suppress," filed on December 29, 2006; the Government's "Response to Defendant's Motion to Suppress," filed on January 18, 2007; and Trejo's "Supplemental Motion to Suppress and Post–Hearing Memorandum of Law," filed on February 9, 2007, in the above-captioned cause. Additionally, the Court considered the testimony and exhibits offered by the parties at a suppression hearing held on February 9, 2007. After due consideration, the Court is of the opinion that Trejo's Motion to Suppress should be denied for the reasons that follow.

## I. FINDINGS OF FACT

On November 10, 2006, Texas Department of Public Safety ("DPS") Sgt. Eduardo Garza received information from an anonymous source that a white Ford van contained a large quantity of marijuana. Garza located the van in the parking lot of the Home Depot at 12221 Montwood in El Paso, Texas. The van had paper plates and appeared to be weighted down in the back. Garza established surveillance on the van, and at approximately 11:54 a.m., he observed a Hispanic male in a grey shirt get in the van and drive away. Garza was able to determine that the front of the van contained no other passengers. Air surveillance followed the van approximately one mile to a residence at 12580 Carlos Bombach in El Paso, where the van entered the garage. Before the van's arrival at the residence, the officers had no knowledge of the van's destination, and no information regarding the owner or residents of the house.

The single-story house at 12580 Carlos Bombach faces north. An attached two-car garage is on the northeast corner, with entry from the garage into the house adjacent to the front door. A rock wall, approximately four feet tall, surrounds the side and back yards of the house. On the east side of the house, the rock wall includes a small gate allowing entry into the side yard. The house's east wall has a sliding glass door which can be seen from outside the rock wall. On November 10, 2006, the interior of the glass door was concealed by vertical blinds in a closed position. Above the rock wall to the south of the residence is a chain fence approximately seven feet high. The house has three bedrooms, including two in the rear of the house—the southwest and southeast bedrooms—each of which has a single window facing south into the backyard. According to Garza, the residence appeared vacant and the yard was unkempt, overgrown, and strewn with trash. These characteristics were in contrast to the neighboring houses on Carlos Bombach. Based on these observations, Garza believed that the residence may have been a stash house.

At approximately 12:20 p.m., after about 25 minutes in the closed garage, the van

left the residence. Garza observed that the van no longer appeared to be weighted down in the back. Garza and other officers at the house followed the van, but both ground and air surveillance · on the van were eventually lost in interstate traffic.

At approximately 5:50 p.m., a white SUV arrived at the residence and entered the garage. Due to the dim evening light, the officers could not identify the driver or determine the number of passengers in the vehicle. Furthermore, the officers' positions precluded them from determining if a second vehicle was in the two-car garage. After the SUV's arrival, the front porch light and a light in the residence went on, illuminating the east and west windows of the house.

Shortly before 7:00 p.m., the officers determined that the further passage of time would present the potential that additional people would arrive at the residence and that narcotics would be removed from the house. The officers decided to approach the house to conduct a "knock and talk," in an attempt to execute a consensual search. As Garza stated at the suppression hearing, he did not seek a search warrant at this time because he felt there was insufficient evidence to establish probable cause.

Garza approached the front door of the house, along with DPS Sgt. Valentine Ceniceros and DPS Sgt. Efrain Martinez. Eight officers provided additional cover. Juan Torrez, Teresa Vargas and two other officers stood outside the gate on the northeast side of the house. Another officer, Ferniza, was positioned directly in front of the garage door. Two more offi-

cers stood at the northwest corner of the house. Canine handler Jay Hawkins was located nearby, standing on the sidewalk in front of the house immediately to the west of 12580 Carlos Bombach.

Facing the front door, Martinez stood to the left while Garza and Ceniceros were positioned opposite him to the right. The three officers were wearing windbreaker jackets with logos displaying their status as law enforcement officers, and wore their badges around their necks. Garza rang the doorbell, and Martinez began knocking. At the front door, both Garza and Ceniceros smelled the odor of marijuana. Martinez detected the order of Downy dryer sheets or fabric softener; based on his training and experience, he believed that to be the smell of a masking agent.

Martinez and Garza continued knocking for approximately ninety seconds, receiving no response from inside the house. During this time, Ceniceros walked to the east side of the house. Standing outside of the rock wall near the garage, he saw a man pull open the vertical blinds in the sliding glass door and look outside. Upon seeing the officers, the man immediately turned and backed away from the door. Ceniceros believed the man was quickly moving toward the rear of the house, and Ceniceros pursued him by entering the side yard through the northeast gate. The other officers at that location immediately alerted Garza, who followed Ceniceros through the gate into the side yard and eventually around the corner into the backyard. While Garza and Ceniceros secured the rear of the residence, the other officers continued to secure their initial positions.[1]

---

1. At the suppression hearing, Trejo contended that the officers initially knocked on the front door and the sliding glass door simultaneously. In support of this, Trejo's counsel elicited testimony from state trooper Teresa Vargas,

who testified that she was positioned directly inside the gate of the rock wall, approximately four feet from the sliding glass door. Vargas testified that she never saw anyone approach the sliding glass door from the inside.

As he turned the corner into the backyard, Ceniceros saw into the window of the southeast bedroom, which had a gap in the curtains on the west side of the window frame. In that gap, Ceniceros saw the dark shadow of a person, along with various boxes. While the bedroom itself was unlit, a hallway light illuminated the room such that a person standing outside in the dim evening light could see into the room. Ceniceros could not identify the person he saw in the southeast bedroom, and was uncertain whether it was even the same person that he had seen at the sliding glass door. When Garza learned this, he also looked into the room. Garza saw no one, but did see several boxes packaged with tape. Based on his training and experience as a narcotics officer, Garza determined that the packaging of the materials was consistent with that of a controlled substance.

Garza proceeded to the window of the southwest bedroom, where he attempted to look into the window in hopes of locating the suspect. While Garza testified at the suppression hearing that he saw boxes of suspected drugs through those blinds, the Court does not credit that statement, finding that neither officer could see into the bedroom from that position.[2] While

---

Trejo argues that Vargas's testimony contradicts that of Juan Torrez, Vargas's supervisor, who stated that he and the members of his team remained outside of the gate at all times.

Trejo contends that the Court should credit the testimony of Vargas because, as a relatively inexperienced officer, she is more likely to provide the Court with a truthful account of the events. He contends that resolving the contradiction in Vargas's favor indicates that numerous officers entered the side yard immediately upon arriving at the residence, without ever observing Trejo at the sliding glass door. However, the Court is of the opinion that the testimony of Vargas and Torrez is not as irreconcilable as Trejo suggests. Instead, her observations are consistent with the time line established by the testimony provided by other officers.

Vargas testified that she had left the scene on two separate occasions to re-position a patrol car. She further testified that after she returned for the second time, she remained at the residence for only approximately five minutes before she and the officers stationed with her left the scene. Given the quick pace at which the events unfolded once the officers approached the house, the Court believes that the events that led Ceniceros and Garza into the backyard simply occurred while Vargas was moving the car.

The Court is of the opinion that Vargas's version of events fits into that provided by the other officers as follows. When Garza, Ceniceros, and Martinez first knocked on the front door, the officers at the northeast corner of the residence were positioned outside of the gate. During this time, Vargas left to move the patrol car, returned, and then was instructed to go and move the car again. When she left, Ceniceros arrived at the northeast corner, at which point he and Torrez saw Trejo approach the sliding glass door on the east side of the residence. (Torrez, unlike Vargas, testified that he did see Trejo looking out the sliding glass door.) Ceniceros immediately entered the side yard, to be followed by Garza, and both individuals proceeded around the corner to the rear of the house. Vargas then returned, having missed Trejo's appearance at the door and the two officers' entry into the side yard. This sequence of events is supported by Ceniceros's testimony during the suppression hearing that he did not see Vargas while at the northeast corner, and the short period of time that Vargas remained at this position after her return.

The Court does credit Vargas's confident testimony regarding the fact that she was then repositioned inside of the gate. The Court finds it likely that when Garza and Ceniceros pursued Trejo to the rear of the house, the other officers positioned outside of the rock wall moved into the side yard to secure the area near the sliding glass door. For reasons the Court will discuss below, the Court is of the opinion that this entry into the side yard is ultimately of no legal consequence.

2. Garza testified that he saw numerous bundles wrapped up in boxes while he peeked through a small gap caused by a crooked blind. The Court has reviewed the photo-

Garza and Ceniceros both testified that they could smell marijuana at the front door, neither smelled anything while at the rear windows.

As he testified at the suppression hearing, it was at this point that Garza first believed he could establish probable cause in order to obtain a search warrant. He believed that probable cause could be founded on the observations of the van, the appearance of the house, the resident's failure to answer the door but appearance at the sliding glass door, and the officers' observation of suspected controlled substances. While Ceniceros remained in the backyard for security, Garza proceeded to the east side of the house and spoke with the officers positioned there to obtain additional information. He then returned to the front door.

In the approximately three minutes that Garza was away from the front door, Martinez continued to knock. Shortly after Garza returned to the front door, and approximately five minutes after Martinez had begun knocking, Martinez heard a muffled voice from inside. Martinez announced, "State police, please open the door," at which point Trejo opened the door. Garza and Martinez immediately detected an overwhelming smell of marijuana.

Garza and Martinez identified themselves as state police officers and indicated that they were at the residence to investigate the possible presence of narcotics. Trejo gave no initial response as he slowly walked toward the officers onto the porch. Both officers found Trejo to be nervous and submissive, and saw that he was sweating profusely despite the cold temperature. Neither found him threatening enough to conduct a pat-down, given his demeanor and the number of officers present, but Martinez in particular was extremely concerned about the possible presence of other individuals in the house.

Martinez then asked Trejo if anyone else was present; Trejo said no. Martinez asked if the officers could check to see if anyone else was present in order to ensure their own safety, and Trejo told them to go ahead. While Martinez unholstered his weapon and prepared to enter the house, Garza continued the conversation with Trejo. Garza contends that he further explained that the officers were there for a narcotics investigation, and needed to conduct a security sweep of the residence; he says that Trejo responded that "I know who you guys are, and I know what I have," and allowed them to enter the house.[3] Throughout the conversation on

graphs that each party has submitted of the blinds in the southwest window. Govt's Resp., Ex. J; Def.'s Hearing Exs. 13, 34. At the suppression hearing, the Court also heard testimony from Maria Mendoza, the owner of the house, and Ignacio Sanchez, a private investigator. Mendoza and Sanchez testified that they went to the house the night before the hearing and attempted to look through the blinds in the rear bedrooms but could not see anything in the rooms. Looking through the small slot identified by Garza in the blinds, Mendoza and Sanchez were able to see only the ceiling fan inside the room, due to the upward slant of the blinds.

Of course, Mendoza and Sanchez cannot confirm that the blinds have not been moved

since November 10, 2006. In the more than three months that passed, Trejo and his wife have moved out of the house, and Mendoza has painted and cleaned various rooms. But Mendoza confirmed that the depiction of the blinds in a photograph taken on the day of Trejo's arrest was consistent with the appearance of the blinds when she looked at them the night before the hearing. Having considered the testimony and all of the photographs, the Court determines that no officer could see the boxes through such a narrow hole in the blinds.

3. It would be a particularly unusual case for an officer to seek consent from a suspect, knowing that another officer had just sought

the front porch, the officers and Trejo all spoke English. At no point during the conversation did any of the officers display their weapons to Trejo or restrain him in any way.

While Ferniza and Trejo waited on the front porch, Garza and Martinez entered the house and conducted a short sweep, checking each room and exiting through the front door approximately 20 to 25 seconds later. During that sweep, the officers saw numerous packaged boxes in the two rear bedrooms.

Upon returning to the front porch, Garza asked Trejo if they could go into the house to discuss the situation, as a number of neighbors had gathered outside to watch the events. Trejo agreed, and was accompanied inside by Garza, Ferniza, and two other officers. The officers sat with Trejo at the kitchen table and attempted to obtain consent for a full search of the house. At this time, Ceniceros returned from the backyard, having heard the officers clear the house during their initial sweep, and entered the front door. Trejo then asked to speak in Spanish. In a short conversation of three to four minutes in Spanish with Ceniceros, Trejo refused

to sign a consent form, stating to Ceniceros that "I'm not going to sign it, you guys already know what's in there." Between approximately 7:20 p.m. and 7:30 p.m., Garza left the residence in order to obtain a search warrant. At this time, Garza learned that canine handler Jay Hawkins had taken the canine to the garage door, where the canine had given a positive alert on the east side of the garage.

While Garza sought a search warrant, several officers remained with Trejo, detaining him on the driveway. Garza subsequently obtained a warrant. Garza's affidavit in support of the warrant application described the anonymous tip, the house at 12580 Carlos Bombach, and the officers' observations of the van. It discussed the officers' initial approach to the house, Trejo's appearance at the side door, and Garza and Ceniceros's entry into the backyard. It stated that "[w]hile in the back yard, the Affiant [Garza] and Sergeant Ceniceros observed in plain-view through the open curtains and blinds of the rear lighted bed room windows cardboard boxes and square shaped bundles in white plastic garbage bags." Govt's Resp., Ex. M at 4. It also described how

and obtained such consent. The Court does not believe that this is such a case. At the suppression hearing, Garza testified that he repeated everything Martinez had said because he felt that Trejo needed to understand what was going on before the officers entered the house. Martinez testified that he does not remember anything about Trejo giving consent to Garza, stating that he was not standing close to Garza at that point, as Trejo had walked past Martinez away from the door and that Martinez was focused on the inside of the house.

The Court credits Martinez's testimony. Based on his testimony, the Court believes that Martinez was singularly focused on the inside of the house, and the potential that another individual located in the house was prepared to cause harm to him and the other officers. The Court accepts that Martinez re-

ceived permission to enter the house while standing with Trejo in the doorway. At that point, Martinez's attention was focused entirely forward into the house, and he was not listening to Garza's further conversation with Trejo. During that time, Trejo continued to walk forward toward Garza, who was standing a few feet away behind a pillar on the porch.

While the Court finds it extremely unlikely that an officer in Garza's position would seek to verify the consent previously given by the suspect, the Court accepts that Garza did engage in a short conversation with Trejo. During that conversation, Trejo did and said nothing that altered or revoked the permission he had given to Martinez for the officers to enter the house. Martinez proceeded to enter the house first, but only after Garza walked up to him and told him to proceed.

"the Affiant and Sergeant Martinez detected an odor of Marihuana emitting from inside said residence."[4] It discussed Trejo's opening of the front door and his ensuing conversation with the officers. As to the officers' attempts to obtain Trejo's consent to search the house, the affidavit stated that,

> The Affiant and assisting officers identified themselves as peace officers and Trejo stated that he knew we were all peace officers and he was nervous. Trejo stated that 'I know what I have and why you guys (police officers) got me.' Sergeant Martinez asked Trejo if Trejo was alone and Trejo stated 'yes.' Sergeant Martinez informed Trejo that an officers safety security sweep would be conducted of the mentioned residence. Trejo granted Sergeant Martinez and the Affiant permission to enter the residence to conduct a safety security sweep of the residence to confirm that no other occupant(s) were inside of the residence. A security sweep of said residence was conducted by Affiant and Sergeant Martinez.

*Id.*, Ex. M at 4. The affidavit then described how Garza and Martinez observed the packaged boxes and bags in the rear bedrooms during their brief sweep of the house.

After the officers executed the search warrant, Trejo was taken to a law enforcement facility. He was read his *Miranda* rights, signed a waiver of those rights, and gave a written statement. After a consideration of all of the testimony and exhibits offered by the parties, the Court is of the opinion that the events of November 10, 2006, were thus substantially similar to the facts set forth by the Government at the hearing and in their briefing.[5]

## II. DISCUSSION

Trejo argues that the marijuana obtained from his residence should be suppressed and excluded from evidence.[6] He contends that (1) the officers' entry into the backyard of the residence was unlawful, as it lacked exigent circumstances that were not manufactured by the officers

---

**4.** At the suppression hearing, Garza conceded that the affidavit was incorrect in stating that Martinez had initially smelled marijuana at the door when in fact it had been Ceniceros.

**5.** At the suppression hearing, Trejo offered a significantly different version of the events. Trejo testified that he arrived at the house at around 5:00 p.m. and did various chores until 6:00 p.m., when he began watching television in the southeast bedroom. At some point thereafter, he heard knocking on the front door and the sliding glass door simultaneously. He also saw lights from flashlights in the southeast bedroom window. He testified that he never heard the doorbell, even though a person would normally hear the doorbell in the southeast bedroom. He immediately ran to open the front door, no more than a minute after the knocking began, at which point four officers—Garza, Martinez, Ceniceros, and an unidentified fourth officer—physically pulled him out onto the porch and asked if he was alone. He contends that the officers never

identified themselves and never mentioned any need to verify their safety. Instead, he stood with Garza while the other three officers entered the house. Trejo testified that he waited with Garza outside the front door for approximately fifteen to twenty minutes. When the other officers returned to the front door, they took Trejo back to the dining room, where they asked him to sign a consent form. He refused, stating that they had already come in without a search warrant. Trejo said that he sat there for approximately twenty minutes, at which point the officers took him outside and detained him in front of the garage door from approximately 7:00 p.m. until 4:00 a.m., when Garza returned with a search warrant.

**6.** At the suppression hearing, the parties stipulated that Trejo, as a resident of the house, has standing under the Fourth Amendment to challenge the admissibility of evidence seized from 12580 Carlos Bombach.

themselves; (2) the officers lacked his consent to enter the house at any point; and (3) the officers' entry into the house was not justified as a protective sweep. He thus contends that all evidence seized as a result of the illegal searches should be inadmissible. He further contends that his arrest was unlawful, as a fruit of the prior illegal searches, and thus his subsequent incriminating statement should also be suppressed.

### A. Ceniceros and Garza's Entry into the Backyard of the Residence

It is well-established that "[a] warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir.2001). The Government concedes that the gated backyard of Trejo's residence was part of the curtilage of the home. Govt's Resp. 8–9. Entry into the backyard by the officers is thus analogous to entry into the home itself. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (noting that the curtilage "has been considered part of the home itself for Fourth Amendment purposes"). Therefore, to validly enter Trejo's backyard, the officers needed a warrant, consent, or probable cause and exigent circumstances. It is undisputed that a warrant was not obtained and consent was not given. Therefore, the Government must show the existence of probable cause and exigent circumstances. *United States v. Wallen*, 388 F.3d 161, 164 (5th Cir.2004) ("[W]arrantless searches are presumptively unreasonable, and the government bears the burden of establishing circumstances to justify them.").

### 1. The Existence of Probable Cause

■ Probable cause exists when under a "totality of circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir.2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (alteration in *Newman*). Trejo contends that probable cause did not exist because "what the government agents had in this case at the time of the approach to the defendant's home was an unsubstantiated and uncorroborated tip from an untested anonymous source." Def.'s Suppl. Br. 3. As Trejo contends, the officers arrived at 12580 Carlos Bombach based on information obtained from an anonymous tip, and had no additional information then about the house or its occupants.

While Garza admitted that the police lacked probable cause when they first approached the house, Trejo directs the Court's attention to the wrong point in time. In determining whether probable cause existed when Ceniceros decided to enter the curtilage of the house, the Court must consider the information known to the officers at that time, rather than when they first arrived at the house. Based on that information, the Court is of the opinion that there was a fair probability that narcotics activity was taking place.

While an anonymous tip standing alone is rarely sufficient to constitute probable cause, such a tip may contribute to a finding of probable cause when combined with independent corroboration. *Gates*, 462 U.S. at 230, 103 S.Ct. 2317. Here, the officers investigated a tip that a particular van contained a significant quantity of marijuana. They found the van and noticed that it appeared to be weighted down in the rear, as though loaded with a large quantity of drugs. They later saw the van

leave 12580 Carlos Bombach, after only 25 minutes in the garage, without the appearance of weight in the back. *See United States v. Summerville,* 477 F.2d 393, 395–96 (5th Cir.1973) (finding probable cause based on a tip and observations that a van was "riding high" and then subsequently "seemed to be heavily weighted down"). Despite Trejo's contentions, the officers' information about the van goes beyond the initial anonymous tip.

Furthermore, the officers' observations were not limited to the van. The appearance of the residence—an unkempt yard strewn with trash, in contrast to neighboring houses—was consistent with that of a stash house. When the officers approached the front door, two officers smelled marijuana and the third smelled what he believed to be a masking agent. *See United States v. Mercadel,* 75 Fed. Appx. 983, 2003 WL 21766541 at *4 (5th Cir.2003) ("[I]f in fact [the officer] smelled marijuana on his approach to the house, that alone would qualify as probable cause to believe that illegal narcotics activity was going on." (citing *United States v. Pierre,* 958 F.2d 1304, 1310 (5th Cir.1992) (en banc) (finding probable cause based on the smell of marijuana from a car stopped at an immigration checkpoint))). The officers, knowing that at least one person was present in the house, received no response when they began knocking on the door. They then saw one person look outside a side door. Immediately upon seeing the officers, that man turned from the door and moved toward the rear of the house. *See Newman,* 472 F.3d at 237 (agents' observation of movement from behind a curtain combined with lack of verbal response from inside the house supports a finding of probable cause); *United States v. Vega,* 221 F.3d 789, 799 n. 26 (5th Cir. 2000) (defendant's flight from the house supports a finding of probable cause). At the time Ceniceros saw Trejo turn and run

upon recognizing the police presence outside his sliding glass door, the evidence then known to him indicated that there was a fair probability that illegal contraband would be found in the house. Therefore, considering the totality of the circumstances, the Court is of the opinion that probable cause existed at that point.

### 2. The Presence of Exigent Circumstances

■ The existence of probable cause would not alone justify the officers' warrantless entry into Trejo's side yard. The Government must also show the presence of exigent circumstances. *United States v. Rodea,* 102 F.3d 1401, 1404 (5th Cir.1996); *United States v. Rico,* 51 F.3d 495, 501 (5th Cir.1995). The Fifth Circuit has stated that exigent circumstances may include the possibility that evidence will be removed or destroyed, the need to pursue a suspect, and immediate safety risks posed to officers and others. *Newman,* 472 F.3d at 237. That court has also enumerated a non-exhaustive list of factors to be considered in determining whether exigent circumstances exist:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*United States v. Blount,* 123 F.3d 831, 837 (5th Cir.1997) (en banc) (citing *Rico,* 51 F.3d at 501).

In assessing these factors, the Court's task is not to question the officers' decisions in light of all the information now before the Court. Instead, "[i]f 'reasonable minds may differ' the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Id.* at 838 (quoting *United States v. Howard,* 106 F.3d 70, 76 (5th Cir.1997)).

In this case, the Government contends that the officers' entry into the backyard was justified by the potential that the suspect could flee from the rear of the house and the risk posed to the safety of the officers and neighbors. At the suppression hearing, Garza testified that he was concerned that the suspect had gone towards the rear of the house in order to obtain a weapon, alert other individuals to the officers' presence, or flee the residence. Both Garza and Ceniceros testified about the commingling of narcotics and firearms, and spoke generally of their experiences in encountering suspects with firearms during previous narcotics investigations.

The first factor favors the existence of exigent circumstances, as Trejo's appearance at the window presented risks of an immediate nature. It would of course not be feasible for the officers to have stopped to seek a search warrant and only then pursued Trejo into the side yard or the house, if in fact he was attempting to flee or cause harm to the officers at the scene.

None of the officers testified as to a concern that the suspected narcotics would be removed from the residence or destroyed, and thus the second factor regarding the possible removal of contraband does not support the existence of exigent circumstances.

The third factor, regarding the danger that could be posed to the officers if they waited for a search warrant, is significant in this case. Based on the information known to the officers at the time, Trejo may have been attempting to retrieve a weapon. Furthermore, it was unknown to the officers whether Trejo was alone in the house, and thus there was a possibility that other individuals in the house may also have been arming themselves. As Garza and Ceniceros testified at the suppression hearing, "firearms are tools of the trade of those engaged in illegal drug activities." *Rodea,* 102 F.3d at 1408 (internal quotation omitted).

To an extent, Trejo is correct that the Government's argument relies on the officers' uncertainty as to whether there were additional individuals or firearms in the house. Trejo directs the Court to various cases stating that such uncertainty, without articulable facts from which affirmative inferences of risks to the officers can be drawn, cannot justify a reasonable suspicion of danger to the officers. However, Trejo's argument only identifies cases in which officers were uncertain whether any individuals were present in the location to be inspected. Here, the officers knew that Trejo was in the house, refused to respond to the officers, appeared at the sliding glass door, and fled toward the rear of the house. While the officers were uncertain as to how many individuals were in the house, they knew that there was at least one, and they also had reason to believe that there may be others and that the occupants could be armed. Therefore, the Court finds that the third factor weighs in favor of a finding of exigent circumstances.

The fourth factor, concerning whether the suspect had knowledge that the police were pursuing him, also favors the Government. A suspect's awareness of the officers' presence and investigation will enhance the immediacy of the situation, increasing the likelihood that the officers will need to take action without waiting to

obtain a search warrant. With at least one individual knocking on his front door and ringing the doorbell, Trejo looked out the sliding glass door and saw additional individuals standing just outside the rock wall on the northeast corner of his residence. According to the officers' testimony, they were wearing windbreakers with law enforcement logos and had their badges around their necks. Any element of surprise that the officers had was lost by that point.[7]

Finally, the Court considers the fifth factor, the officers' knowledge that persons engaged in narcotics activities are known to destroy contraband and attempt to escape capture. The Court also finds this factor to militate in favor of exigent circumstances. While the only exits from the house were the front door, the garage door, and the sliding glass door on the east side of the house, there was no way for the officers to have that information from their positions outside of the curtilage. It was at least reasonable for the officers to believe that Trejo was attempting to flee when he turned and ran toward the rear of the house. While the officers did not specifically cite the destruction of evidence as a concern during the suppression hearing, Garza and Ceniceros both testified as to the general nature of narcotics investiga-

tions and the possibility that a suspect in such an investigation could seek to destroy evidence. The house's known occupant's failure to respond to the officers "added to an intense and volatile situation and—importantly—to the likelihood that significant evidence was being destroyed." *Blount,* 123 F.3d at 838.

Considering the information known to the officers at the time Trejo looked out of the sliding glass door, the Court is of the opinion that the officers were genuinely and reasonably concerned about the potential that Trejo was attempting to flee from the officers and the risks that he and other possible occupants in the house posed to the safety of the officers at the scene. The Court therefore determines that exigent circumstances were present. Having determined that the officers' entry into the side yard was justified by the existence of probable cause and exigent circumstances, the Court need not consider the application of the "protective sweep" doctrine.[8]

### 3. The Officers' Conduct and the Creation of the Exigent Circumstances

▇ Trejo contends that even if exigent circumstances did exist, they were entirely of the officers' own creation, as

---

**7.** Trejo correctly contends that this was in part due to circumstances of the officers' own making, in that Trejo would likely not have learned of the officers' presence but for their approach to the house. The Court will address this argument below.

**8.** The Government argues in the alternative that entry into the curtilage was justified under the "protective sweep" doctrine. "A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The foundation for such a sweep may be based on reasonable suspicion; it does not require probable cause. *Id.* In *United States v. Gould,*

the Fifth Circuit held that a protective sweep need not be incident to an arrest, but found it unclear whether a protective sweep could be justified if the police did not first gain consensual entry into the home. 364 F.3d 578, 586 (5th Cir.2004). The court stated that "[w]hether (or if so to what extent and under what conditions) the doctrine of 'protective sweep' authorizes a warrantless, non-consensual *entry* into a home that would *not* be authorized under the more general doctrine of 'exigent circumstances' is unclear." *Id.* at 587 n. 9. The Court need not reach that issue here, as it finds that the officers' entry into the backyard was justified by the presence of exigent circumstances and probable cause.

the officers' approach to the house was an unreasonable attempt to create circumstances justifying an arrest. Exigent circumstances "may not consist of the likely consequences of the government's own actions or inaction." *Vega*, 221 F.3d at 799. Exigencies are manufactured if (1) the officers acted with a bad faith intent to avoid the warrant requirement or (2) the officers' use of a particular tactic was "sufficiently unreasonable or improper as to preclude dispensation with the warrant requirement." *Gould*, 364 F.3d at 590.

First, exigencies are manufactured "if the government's actions are intentionally taken to avoid the warrant requirement." *Howard*, 106 F.3d at 78. The Court easily determines that the officers in this case were not acting in such bad faith. They approached the house in order to obtain additional information and seek consent to search. As Garza testified, the officers did not believe they had probable cause to obtain a search warrant prior to approaching the house, a reasonable conclusion with which the Court agrees. Only after the officers began knocking on the front door did the situation become volatile and force them to make an immediate decision to pursue Trejo into the backyard. As discussed above, the immediacy of the situation precluded the officers from stopping to secure a warrant and only then attempting to locate Trejo and prevent him from fleeing or causing harm.

Second, the Court finds that the officers' investigative tactics were reasonable. The officers conducted a "knock and talk," in which officers approach a residence, identify themselves, and may attempt to gain the occupant's consent to search.

> The purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence. Instead, the purpose of a 'knock and talk' approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search.

*United States v. Gomez–Moreno*, 479 F.3d 350, 355 (5th Cir.2007). The Fifth Circuit has recognized this strategy to be a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *Jones*, 239 F.3d at 720–21.

Here, the Court finds it reasonable that Garza and the other officers conducted a "knock and talk." After watching the house for nearly seven hours, concerned about the dim light of the early evening, and believing that they did not have sufficient evidence to obtain a search warrant, the officers decided to approach the house. Furthermore, the manner in which they did so was reasonable. While eleven officers were involved at the scene, only three went to the front door, while the others placed themselves in locations around the front exterior of the home. The officers did not show force, they did not employ loud noises, and they made no demands of entrance. By knocking on the front door, the officers were employing a tactic that was both legitimate and reasonable.

The Court therefore concludes that the officers did not create the exigent circumstances in this case. Only when Trejo refused to answer the door, looked out the window, and quickly turned to run were the officers forced to act to protect their own safety and attempt to prevent Trejo from fleeing. *See Newman*, 472 F.3d at 239 ("When the occupants of the house create the circumstances amounting to the exigency in response to a reasonable law enforcement tactic, the agents cannot have manufactured it themselves.").

### 4. Objects Seen in the Rear Bedroom Window

Since Garza and Ceniceros were in the backyard lawfully, their observations

through the southeast bedroom window were permissible, as the objects in that window were in plain view. Information obtained by observation of an object in plain view may be used to support a finding of probable cause. *Texas v. Brown,* 460 U.S. 730, 738 n. 4, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). "An object falls within plain view if law enforcement officers are lawfully in a position from which they view it, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to it." *United States v. Munoz,* 150 F.3d 401, 411 (5th Cir.1998). Since Garza and Ceniceros were lawfully in the backyard, it was permissible for them to look into the windows in search of the suspect that had fled from the sliding glass door. There, they saw packaged boxes through a gap in the curtains of the southeast bedroom's window. Based on their training, the officers believed that the packages wrapped in cellophane and tape were immediately apparent as narcotics. *See Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (recognizing that the illegal nature of narcotics packages may be immediately apparent to experienced law enforcement officials).

Since Garza and Ceniceros were justified in entering the backyard and looking into the rear windows, the search does not constitute a violation of the Fourth Amendment. The officers' observations of the marijuana in the southeast bedroom were thus lawfully obtained, and their inclusion in Garza's affidavit in support of a search warrant was appropriate.[9]

**B. The Officers' Entry into the Residence**

 The officers' subsequent entry into the residence implicates another ex-

ception to the Fourth Amendment warrant requirement. An individual may give voluntary consent to entry onto, or search of, his property by law enforcement officers. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Government bears the burden of demonstrating by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Tompkins,* 130 F.3d 117, 121 (5th Cir.1997). "Voluntariness is determined from the totality of the circumstances surrounding the search." *Id.* Relevant factors in this analysis include:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. Although all six factors are relevant, no single factor is dispositive or controlling of the voluntariness issue.

*Id.* (internal quotation omitted).

The Court finds that the totality of the circumstances indicates that Trejo consented to Garza and Martinez's entry into his residence. When Martinez asked if he and Garza could enter to determine if anyone else was present in order to ensure their own safety, Trejo told them to go ahead. At that point, Trejo was not in custody, and had not been subjected to force or coercion; the officers did not even conduct a pat-down. While the initial conversation was in English, he does not contend that he did not understand the officers. No other evidence before the Court

---

9. As discussed above, the Court has determined that the packaged narcotics were seen only in the window of the southeast bedroom.

The consequences of Garza's statements that he also saw boxes in the southwest window will be addressed below.

calls into question the voluntariness of Trejo's consent.

■ Lawfully in the house, Garza and Martinez properly limited their search. A valid consensual search is limited to the scope of consent that was given. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (scope of consent is measured by "objectively" reasonable understanding of the conversation between the officer and the suspect). Here, the officers were given consent to check the residence for the presence of other people. They conducted a short 20– to 25–second scan of the rooms and closets.

### C. The Search Warrant

#### 1. Evaluating the Sufficiency of a Warrant

■ A court generally will not second guess the magistrate's determination regarding the existence of probable cause in granting a search warrant. Instead, a magistrate judge's determination on probable cause is given "great deference" by the reviewing court, *United States v. Ishmael,* 48 F.3d 850, 857 (5th Cir.1995), and this Court's duty "is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed," *Gates,* 462 U.S. at 238–39, 103 S.Ct. 2317 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)) (alterations in *Gates* ). If the Court were to apply that standard to the search warrant obtained by Garza, accepting that all facts in the search warrant were true and legally obtained, the Court has no doubt that the warrant was adequately supported by probable cause.

■ But the Court has determined that two statements included in Garza's affidavit in support of the search warrant application were incorrect. First, Garza stated that Martinez had initially smelled marijuana at the front door; in fact, as he acknowledged at the suppression hearing, it was Ceniceros. Second, Garza stated that he was able to see packaged boxes which he believed to be consistent with illegal narcotics through the horizontal blinds in the window of the southwest bedroom—a contention that the Court has already rejected as improbable given the positioning of the blinds. Therefore, the Court must evaluate the sufficiency of the warrants in light of those misrepresentations.

■ If a false statement has been included in a search warrant affidavit, the Court applies the standard set forth by the Supreme Court in *Franks v. Delaware.* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *See United States v. Mays,* 466 F.3d 335, 343 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1313, 167 L.Ed.2d 124 (2007) (applying *Franks* test in this context). This requires Trejo to show that "(1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause." *United States v. Brown,* 298 F.3d 392, 395 (5th Cir.2002). "The second prong is often decisive, because even if the defendant proves that a statement was deliberately false or made with reckless disregard of its truth, he would still not prevail if the remainder of the affidavit set forth sufficient facts for a finding of probable cause." *Mays,* 466 F.3d at 343. In applying the second prong, "a court must 'make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit [minus the alleged misstatements], there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Froman,* 355 F.3d 882, 889 (5th Cir.2004) (quoting *United States v. Byrd,* 31 F.3d 1329, 1340 (5th Cir.1994)) (alteration in *Froman* ).

## 2. Garza's Confusion of Ceniceros and Martinez

As to Garza's mistaken identification of the second officer who had smelled marijuana at the door, the Court determines that the misstatement was not included in the affidavit "knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155, 98 S.Ct. 2674. Rather, the Court believes Garza made a simple mistake in confusing the two officers. But even if the misstatement satisfied the first prong of *Franks*, excising the misrepresentation from the affidavit does not undermine the finding of probable cause. Even if the affidavit only stated that the affiant, Garza, had smelled marijuana at the front door, probable cause would still exist based on all of the other information provided in the affidavit.

## 3. Garza's Misrepresentation Regarding the Southwest Bedroom

Turning to Garza's misrepresentation regarding the boxes he saw in the southwest window, the Court has already determined that the evidence described in the affidavit that was known to the officers at that point adequately established probable

cause. As discussed above, the Court is of the opinion that probable cause existed at the moment Ceniceros and Garza decided to enter the side yard in pursuit of Trejo. From that point forward, nothing was drawn to the officers' attention that would undermine the likelihood that illegal narcotics activity was taking place within the residence. In fact, subsequent events only strengthened the basis for probable cause. Even assuming that Garza's misrepresentation regarding his observation of the boxes he saw in the southwest window was knowing and intentional,[10] setting aside that false statement would still produce an affidavit that described everything known to the officers when they entered the side yard of the residence, along with Garza and Ceniceros's observations in the southeast window, the officers' observations of Trejo at the front door, and their sighting of the marijuana in the rooms during their consensual sweep of the house. Taken together, these facts more than adequately establish a basis of probable cause.[11]

Since the Court has determined that the search warrant was based on incorrect information rather than a prior illegal search and that the redacted warrant remains valid, the Court accepts that the evidence

---

10. The affidavit stated that, "[w]hile in the back yard, the Affiant [Garza] and Sergeant Ceniceros observed in plain-view through the open curtains and blinds of the rear lighted bed room windows cardboard boxes and square shaped bundles in white plastic garbage bags." Govt's Resp., Ex. M at 4. The Court finds it plausible that Garza's misstatement in the affidavit could have been no more than a reckless mistake in pluralizing the word "window." But Garza firmly repeated his claim of seeing marijuana in the southwest bedroom during the suppression hearing. Having rejected this claim, the Court can only assume that it was an intentional misrepresentation by Garza, both in the affidavit and at the hearing.

11. That the officers saw the packaged boxes in both the southwest and southeast bed-

rooms during their consensual sweep of the house makes it particularly unusual that Garza would misrepresent his observations from the backyard of the residence. The information does nothing to strengthen an already solid foundation of probable cause. The same concern is raised by Garza's statement that he secured a second grant of consent from Trejo before entering the house for the short sweep. It seems to the Court that in both cases Garza is simply attempting to exaggerate his observations in order to strengthen the legal basis for his case. Not only do Garza's misrepresentations not strengthen the Government's arguments for the legality of the officers' searches, they also call into question the credibility of his entire team and their motives in engaging in certain investigative tactics. Misstatements like these only serve to undermine the officers' tactics and risk the

obtained by means of the warrant is admissible.

### D. The Statements Made by Trejo

Finally, Trejo argues for the suppression of his statements to the officers. This includes his pre-arrest statement on the front porch and his post-arrest statement at the law enforcement facility.

#### 1. Trejo's Initial Statements

As to Trejo's initial statement, "I know who you guys are, and I know what I have," voluntary and non-custodial statements do not implicate the Fifth Amendment. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Officers are required to give Miranda warnings "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.* In determining whether an individual was in custody, the Court must examine all of the circumstances, ultimately asking "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)) (alteration in *Stansbury* ).

While conversing with the officers, Trejo was not subjected to any coercive show of authority, such as the use of a commanding tone of voice or physical contact. The officers did not display their firearms to him at any time, nor is there any indication that he was told that he could not leave. Thus, the Court finds that Trejo was not in custody when he opened the front door and the officers requested his consent to search the house. *See United States v. Chavez,* 281 F.3d 479, 484 (5th Cir.2002) (discussing similar circumstances and determining that the suspect was not in custody). The Court therefore concludes that Trejo's initial statements should not be suppressed.

#### 2. Trejo's Post–Arrest Statements

At the suppression hearing, Trejo's counsel stipulated that the admissibility of his post-arrest statement is tied to the legality of the initial searches. Trejo contends that his post-arrest statements must be suppressed only because they were derived from an illegal arrest based on a prior illegal search.[12] However, as the Court has discussed above, the officers' searches of the residence and thus their subsequent arrest of Trejo were lawful.

### III: CONCLUSION

Based on the foregoing analysis, the Court is of the opinion that Garza and Ceniceros's entry into the curtilage of Trejo's residence was justified by the exis-

---

exclusion of evidence that might otherwise be admissible.

Nonetheless, while the Court is concerned by Garza's statements in this case, the Court is also mindful of the values at hand in the application of the exclusionary rule and its exceptions under the Fourth Amendment: that "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). While the Court does not credit several of Garza's statements in this

case, the officers' conduct did not infringe upon Trejo's rights under the Fourth Amendment.

**12.** Trejo thus does not raise an argument that his post-arrest statement was independently inadmissible as involuntary or in violation of *Miranda.* The Court sees no reason to question the admissibility of the statements on these grounds; Trejo was read his *Miranda* rights and signed a written waiver of those rights before giving his incriminating statement, and no evidence before the Court suggests that the statement was involuntary.

tence of probable cause and exigent circumstances. In the backyard, the officers observed what appeared to be packaged narcotics in plain view through a rear window. After finally responding to the officers at the front door, Trejo gave voluntary consent for Garza and Martinez to conduct a short sweep of the house to ensure their own safety, at which point the officers observed the marijuana in each of the rear bedrooms. Garza then obtained a search warrant that was validly supported by probable cause. Since the officers' searches of Trejo's residence were consistent with his Fourth Amendment rights, the marijuana was seized lawfully and his subsequent arrest was legal. Therefore, the physical evidence and his incriminating statements are admissible, and Trejo's Motion to Suppress must be denied.

Accordingly, **IT IS ORDERED** that Defendant Gerardo Trejo's "Motion to Suppress" (Docket No. 21) is **DENIED**.